| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| WILLIAM EDWIN SMALL, | ) | Case No. 8:25-bk-04409-CPM |
| | ) | Chapter 13 |
| Debtor. | ) | |
| | ) | |

**MOTION TO CONVERT DEBTOR'S CASE TO CHAPTER 7
PURSUANT TO 11 U.S.C. SECTION 1307**

Creditors SCC Holdings, LLC ("SCC Holdings") and Dallas International, LLC ("Dallas", and together with SCC Holdings, the "Movant(s)"), by and through their undersigned counsel state as follows for their *Motion to Convert Debtor's Case to Chapter 7 Pursuant to 11 U.S.C. Section 1307* (the "Motion") pursuant to United States Code Tile 11 (the "Bankruptcy Code"), Section 1307 and submit that, based on Debtor's bad faith and prepetition fraud on his creditors and his fraud on the Bankruptcy Court, conversion of Debtor's bankruptcy case to Chapter 7 of the Bankruptcy Code is in the best interest of creditors and Debtor's bankruptcy estate. Movants state as follows in support of the Motion:

**THE PARTIES**

1.      Debtor, William Edwin Small (the "Debtor") and Brian Jenks ("Jenks"), Greg Boller ("Boller"), and Debtor's ex-wife Karen Small ("Ms. Small"), are members of Movant, SCC Holdings. SCC Holdings is a Michigan limited liability company formed on May 15, 2012 ("SCC Holdings"). **Exhibit A**, SCC Holdings Articles of Organization. When referred to together, Debtor, Jenks, Boller, Ms. Small and SCC Holdings shall be referred to as the "SCC Parties."

2.      Debtor, Jenks and Boller were each also owners of Movant, Dallas, a company formed on July 25, 2011. **Exhibit B**, Dallas Articles of Organization.

1

3. Movants are both substantial creditors of Debtor.

## BACKGROUND

*SCC Holdings' Claim*

4. On January 27, 2022, the SCC Parties (and a related company, SCC Services, LLC), and Dallas entered into an Obligation Resolution Agreement with Oxford Bank (the "Debt Resolution Agreement"), concerning the repayment of amounts owed to Oxford Bank. Oxford Bank was granted a pledge of the Great Elm Equity (defined below) to secure the obligations owing to Oxford Bank. **Exhibit C**, Debt Resolution Agreement.

5. On or about February 3, 2022, SCC Holdings sold substantially all of its assets to Sterling Commercial Credit, LLC, a Delaware limited liability company ("SCC Delaware"). In return, SCC Holdings received a 20 percent ownership interest in SCC Delaware (the "SCC Delaware Equity") and a minority ownership interest (the "Great Elm Equity") in Great Elm Capital Corp. ("Great Elm"), which owns 80 percent of SCC Delaware (the "Sale").

6. After the Sale, SCC Holdings' only assets were its Sterling Delaware Equity and its Great Elms Equity, with its only source of income coming from the distributions it received from the Great Elm Equity. All distributions with respect to the Great Elm Equity were required to be paid to and held in escrow by Oxford Bank pursuant to a certain Amended and Restated Agreement dated as of October 20, 2023, by and between Oxford Bank, Debtor, SCC Holdings, Jenks, Boller, and Ms. Small (the "SCC Escrow Agreement"). **Exhibit D**, SCC Escrow Agreement.

7. After the eventual sales of the Great Elm Equity and the SCC Delaware Equity, SCC Holdings' only asset is the cash held by Oxford Bank in the amount of $702,935.17 (the "SCC Holdings Escrow Funds") and approximately $161,000 held at the Bank of Ann Arbor (the

"BofA Funds"). SCC Holdings' assets are to be distributed to its members according to their capital accounts in SCC Holdings. *See* **Exhibit D**. However, before that distribution could happen the claims against Debtor for the significant damages Debtor caused to SCC Holdings, and the amount of property and money Debtor diverted from SCC Holdings to himself for his own personal gain, had to be determined. Debtor also alleged claims against Jenks, Boller and SCC Holdings.

8. Pursuant to an Arbitration Agreement dated as of November 30, 2023, Debtor, SCC Holdings, Jenks, Boller and Karen Small initiated a private arbitration proceeding to determine the claims involving SCC Holdings ( the "Arbitration") using the arbitrator selected by Debtor. **Exhibit E**, the Arbitration Agreement.

9. On June 17, 2024, SCC Holdings was granted the Arbitrator's Final Award in the amount of $659,588.52 against Debtor (the "Arbitration Award"). **Exhibit F**, Arbitration Award. All of Debtor's claims against Jenks, Boller and SCC Holdings were denied in the Arbitration. The Arbitration Award was confirmed by the Opinion & Order Denying Edwin Small's Motion to Vacate Arbitration Award & Confirming the Arbitration Award (the "Order Affirming Arbitration Award"). **Exhibit G,** Order Affirming Arbitration Award.

10. The Arbitration Award related to Small's improper conduct as an owner and a manager of SCC Holdings. More specifically, the arbitrator found the following:

a. Debtor committed conversion and breached his fiduciary duties to SCC Holdings by causing SCC Holdings to sell a certain Ferrari for $99,500, but rather than depositing the sale proceeds into the company's existing checking account he kept the funds.

b. Debtor made an improper payment of $15,000 from SCC Holdings to his personal account in July 2019.

3

c. Debtor committed embezzlement wherein in March 2021, Debtor purchased a building through another business entity GEMK Holdings but used SCC Holdings' funds to pay the $25,000 down payment for the property.

d. Debtor committed embezzlement through a $50,000 withdrawal from the SCC Holdings account in June 2020.

e. Debtor was found liable to SCC Holdings in the amount of $220,088.52 for American Express charges that were charged to Debtor's ex-wife's SCC Holdings card for Debtor's personal expenses and concealed those payments by categorizing the payments as interest expenses on the SCC Holdings books and records.

*See* **Exhibit F**.

11. The SCC Holdings Escrow Funds held by Oxford Bank and the BofA Funds may be withdrawn only upon the written instructions signed by Debtor, Boller, Jenks, and Karen Small, or an order of a court of competent jurisdiction. *See* **Exhibit D.** To date, the required parties have not provided instructions to Oxford Bank on the manner of distribution of the SCC Holdings Escrow or to the Bank of Ann Arbor for the BofA Funds.

***Dallas International, LLC's Claims***

12. Debtor was removed as an owner of Dallas on January 1, 2016 (the "Removal"). **Exhibit H**, Dallas Complaint, p. 3.

13. Despite Debtor's Removal from Dallas, Debtor improperly continued to act on behalf of Dallas.

14. Fratenite, LLC d/b/a The Ganwood Company ("Fratenite"), a company owned one third by Debtor and the remaining equity owned by other parties, borrowed substantial funds from Dallas pursuant to a line of credit agreement and a series of term loans between Dallas and

Fratenite (the "Dallas Loans"). **Exhibit H,** pp. 3–4.

15.     Debtor and the other members of Fratenite executed guaranties for the Dallas Loans (the "Dallas Guaranties"). **Exhibit H,** p.4.

16.     Fratenite defaulted on the Dallas Loans, and on or about August 10, 2022, Dallas filed suit against Fratenite, Debtor and the two other guarantors of the Dallas Loans jointly and severally for damages in the $2,531,340.60, with State of Michigan Circuit Court for the County of Livingston Business Court (the "Livingston Circuit Court"), Case No. 31482-CB (the "Dallas Suit"). **Exhibit H,** pp.10–13.

17.     The Dallas Suit seeks damages for breach of the Dallas Loans and Dallas Guaranties. **Exhibit H,** pp.11–13.

18.     The Dallas Suit was pending as of Debtor's Petition Date, and the voluntary petition was filed one day before the Livingston Circuit Court scheduled a hearing to rule on a substantive dispositive motion. **Exhibit I**, Livingston Circuit Court Notice of Hearing. The Livingston Circuit Court has stayed the Dallas Suit against not only Debtor, but also against the two non-debtor guarantors.

***Debtor's Chapter 13 Case***

19.     Following Debtor's petition date of June 30, 2025 (the "Petition Date"), on July 25, 2025, Debtor filed his Schedules A through J ("Schedules") and Statement of Financial Affairs ("SOFA"), which he signed under penalty of perjury.

20.     Debtor's Schedules list a 30 percent interest in a "SCC Holdings, LLC" that, according to Debtor's SOFA at Question 27, was formed on May 1, 2025. According to the State of Michigan's Bureau of Licensing and Regulatory Affairs business entity registry ("Michigan Business Registry"), a second company called "SCC Holdings, LLC" was formed by Brian

Redding on May 1, 2025 ("New SCC Holdings"), this company is different from Creditor, SCC Holdings which was formed in 2015. **Exhibit J**, New SCC Holdings Articles of Organization. Debtor's Schedules make no mention of his interest in Movant, SCC Holdings.

21.     In addition to the material omission of his interest in Movant, SCC Holdings, Debtor's representations in his Schedules and SOFA were materially false and omitted key information including as follows:

a. Debtor's Summary of Schedules indicate that Debtor has primarily consumer debts when, in reality, nearly all of Debtor's obligations are business-related debts.

b. Debtor failed to list his interest in the SCC Holdings Escrow Funds.

c. Debtor failed to list his interest in the BofA Funds.

d. Debtor did not disclose the Arbitration.

e. Debtor did not list SCC Holdings as a creditor, and omitted the Arbitration Award granted in favor of SCC Holdings against Debtor in the amount of $659,588.52.

f. Debtor did not list Dallas as a creditor, and omitted the Dallas claim in the amount of $2,531,340.60.

g. Debtor did not list an interest in GEMK Holdings which, according to the Michigan Business Entity Registry remains an active limited liability company albeit, not in good standing for failure to file its required annual reports since 2023. The registered agent is listed as W. Edwin Small.

h. Debtor did not list an interest in Asset Based Audit Consultants, LLC which is a company that is active and in good standing. The registered agent is listed as William Edwin Small.

22.     Debtor appeared for his Section 341 of the Bankruptcy Code, first meeting of creditors on July 25, 2025 ("Meeting of Creditors"). The Chapter 13 Trustee, through counsel, adjourned the Creditor Meeting for the reason that Debtor has not filed his last four years (2021 through 2024) of personal tax returns thus, Debtor had not timely provided the Chapter 13 Trustee copies of his tax returns as required by the Bankruptcy Code.

**ARGUMENT**

23.     Section 1307(c) of the Bankruptcy Code provides: ". . . . on request of a party in interest . . . . and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause. . . ." Section 1307(c) provides a non-exhaustive list of causes for dismissal including "unreasonable delay by the debtor that is prejudicial to creditors." 11 U.S.C. § 1307(c)(1) (*see In re Henson*, 289 B.R. 741, 750–51, Bankr. N.D. Cal. 2003).

24.     In addition to the enumerated causes for dismissal, "bad faith falls under the catch-all of 'cause'" pursuant to section 1307(c) of the Bankruptcy Code. *In re Crawford*, 2024 Bankr. LEXIS at * 13 (Bankr. M.D. Fla. Apr. 24, 2024). "In assessing bad faith, the Court looks at the totality of the circumstances." *Id.* (relying on *In re Blige,* 2019 Bankr. LEXIS 2654 (Bankr. S.D. Ga. Aug. 21, 2019) (citing *Kitchens v. Georgia R.R. Bank and Trust Co.* (*In re Kitchens*), 702 F.2d 885, 888–89 (11th Cir. 1983)).

***Debtor's intentional omissions and perjury demonstrate bad faith***

25.     When looking at the totality circumstances here, it is apparent that Debtor filed this case in bad faith and has caused his creditors unreasonable delay. *See* 11 U.S.C. §1307(c)(1); *see also In re Kitchens*, 702 F.2d 885.

26.     First, Debtor is ineligible for relief under Chapter 13 of the Bankruptcy Code as prescribed by Section 109(e) of the Bankruptcy Code. Debtor omitted claims of both SCC Holdings and Dallas from his Schedules, which had he listed, would have disqualified him for Chapter 13 relief because SCC Holdings' unscheduled claim alone totals $659,588.52.[1] Debtor was not granted a stay of enforcement of the Arbitration Award pending appeal thus, Movant's collection rights in the Arbitration Award were actionable (or, liquidated and non-contingent) until Debtor filed this Chapter 13 Case. Additionally, Dallas's unscheduled claim for Debtor's guarantor debt and subject of the pending Livingston Circuit Court case, totals $2,531,340.60. It is apparent that Debtor intentionally concealed his actual liabilities to creditors in order to avail himself of the Automatic Stay under Chapter 13 of the Bankruptcy Code without the actual right to do so, merely to impair his creditors.

27.     In addition to omitting material information about his liabilities, Debtor also omitted from his Schedules material information pertaining to his assets, for example, Debtor only disclosed an interest in New SCC Holdings and failed to indicate that SCC Holdings has liquidated cash, ready for distribution to its members, subject only to agreement by the SCC Parties or otherwise by adjudication of a court of competent jurisdiction. *See* **Exhibit E**.

28.     Debtor likewise omitted from disclosure in his Schedules and SOFA his interest in other businesses, in particular, GEMK Holdings and Asset Based Audit Consultants, LLC.

29.     Debtor's misrepresentations have not only caused Movants and Debtor's other creditors unreasonable delay and prejudice, Debtor committed perjury by intentionally omitting material financial information from his Schedules, SOFA and other statements. This is not the

---

[1] 11 U.S.C. § 109(e) sets forth the limits for a debtor to qualify under chapter 13 at, secured debt: $1,580,125; and unsecured debt: $526,700.

behavior of an honest Debtor filing in good faith, but rather, the behavior of a Debtor seeking to achieve and unfair advantage over his creditors for an unfair purpose.

30. In step with his continued disregard for and abuse of the bankruptcy process, Debtor also failed to remit copies of his tax returns for the two years prior to the petition date, to the chapter 13 trustee at least seven days prior to the Meeting of Creditors, once again ignoring his statutory obligations under the Bankruptcy Code. *See* 11 U.S.C § 521(e)(2)(A).

31. Debtor's complete disregard for his fundamental duties as a debtor in a bankruptcy proceeding is prejudicial to his creditors where Debtor is taking advantage of the automatic stay when he has not just failed to file one year, but ***four*** years of his personal tax returns. Debtor is enjoying the benefit of the automatic stay under Chapter 13 of the Bankruptcy Code and all its protections while not fulfilling his codified duties.

32. Conversion to Chapter 7 is appropriate since a significant amount of Debtor's obligations arose through his fraudulent actions against SCC Holdings which render some or all of his debts nondischargeable under Chapter 7 of the Bankruptcy Code. The findings of fact contained in the Arbitration Award show that Debtor has a history of wrongful conduct to the detriment of his creditors.

***Conversion, rather than dismissal, is appropriate under these circumstances***

33. Conversion should be granted when in the best interest of creditors and has been granted in circumstances where there is evidence that a debtor has demonstrated a lack of candor with the Bankruptcy Court and where Debtor's estate is "best served by the conversion of the case to chapter 7 and the appointment of a chapter 7 trustee." *In re Grigsby*, No. 19-10027, 2019 Bankr. LEXIS 817, at *18 (Bankr. W.D. La. Mar. 13, 2019). Wherein a "Chapter 7 trustee will be able to investigate Debtors' tangled financial affairs and omissions from their bankruptcy schedules and

distribute money to creditors to ensure an equitable distribution to them." *Id*. at *18–19 (Bankr. W.D. La. Mar. 13, 2019) (relying on *In re Eatman*, 182 B.R. 386, 394 (Bankr. S.D.N.Y. 1995).

34.     Furthermore, Debtor abused the bankruptcy process to create his estate which now holds assets that can be liquidated to pay creditors. If this case is dismissed rather than converted, it is all but certain that his creditors will receive zero payments. A Chapter 7 trustee is in the best position possible to facilitate a fair resolution of creditor claims. If the case is converted, the Chapter 7 trustee will be able to objectively "investigate Debtor['s] tangled financial affairs and omissions from [his] bankruptcy schedules" to ensure that property of Debtor's estate is properly and fairly distributed to his creditors.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein above, Movants pray that this court grant the Motion and immediately convert Debtor's case to Chapter 7 of the Bankruptcy Code.

Dated: August 6, 2025

Respectfully submitted by,

FURR AND COHEN, P.A.
2255 Glades Road, Suite 419A
Boca Raton, Florida 33431
(561) 395-0500
(561) 338-7532 – facsimile

By /s/ Jonathan T. Crane_____
Jonathan T. Crane, Esq.
Florida Bar No. 1039351
E-mail: jcrane@furrcohen.com
***Local Counsel to Kimberly Ross Clayson and Thomas Coughlin (as counsel for Dallas International, LLC, SCC Holdings, LLC, Brian Jenks, and Greg Boller)***

Taft Stettinius & Hollister LLP
By:  *s/Kimberly Ross Clayson*
Kimberly Ross Clayson, Esq.
27777 Franklin Road
Suite 2500

Southfield, MI 48034
Tel.: (248) 351-3000
Email: kahrens@meltzerlippe.com
Thomas Coughlin, Esq.
27777 Franklin Road
Suite 2500
Southfield, MI 48034
Tel.: (248) 351-3000
E-Mail: tcoughlin@taftlaw.com

## PROOF OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

U.S. Mail and/or CM/ECF to all parties listed below on this 6th day of August 2025.

Dated:    August 6, 2025

FURR AND COHEN, P.A.
2255 Glades Road, Suite 419A
Boca Raton, Florida 33431
(561) 395-0500
(561) 338-7532 – facsimile

By */s/ Jonathan T. Crane*
Jonathan T. Crane, Esq.
Florida Bar No. 1039351
E-mail: jcrane@furrcohen.com
***Local Counsel to Kimberly Ross Clayson
and Thomas Coughlin (as counsel for
Dallas International, LLC, SCC Holdings,
LLC, Brian Jenks, and Greg Boller)***

**By Notice of Electronic Filing:** All parties registered with CM/ECF to receive electronic notices.

**By U.S. Mail:** All creditors and parties on the attached official court matrix and upon the below creditors and parties who have opted out of CM/ECF electronic noticing

# EXHIBIT A

# (SCC Holdings Articles of Organization)

# *Michigan Department of Licensing and Regulatory Affairs*

## *Filing Endorsement*

*This is to Certify that the ARTICLES OF ORGANIZATION (DOMESTIC L.L.C.)*

*for*

*SCC HOLDINGS, LLC*

*ID NUMBER: D76677*

*received by facsimile transmission on May 11, 2012 is hereby endorsed*

*Filed on May 15, 2012 by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 15TH day of May, 2012.*

*Director*

**Bureau of Commercial Services**

BCS/CD-700 (Rev. 04/11)

## MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## BUREAU OF COMMERCIAL SERVICES

| Date Received | (FOR BUREAU USE ONLY) |
|---|---|
| | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document. |

Name
Todd Jennings

Address
10559 Citation Dr., Ste. 204

| City | State | ZIP Code |
|---|---|---|
| Brighton | MI | 48116 |

EFFECTIVE DATE:

↻ Document will be returned to the name and address you enter above. ⇦
If left blank, document will be returned to the registered office.

## ARTICLES OF ORGANIZATION
### For use by Domestic Limited Liability Companies
(Please read information and instructions on reverse side)

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

**ARTICLE I**

The name of the limited liability company is: SCC Holdings, LLC

**ARTICLE II**

The purpose or purposes for which the limited liability company is formed is to engage in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan.

**ARTICLE III**

The duration of the limited liability company if other than perpetual is: _____

**ARTICLE IV**

1. The name of the resident agent at the registered office is: W. Edwin Small

2. The street address of the location of the registered office is:

| 10559 Citation Dr., Ste. 204 | Brighton | , Michigan | 48116 |
|---|---|---|---|
| (Street Address) | (City) | | (Zip Code) |

3. The mailing address of the registered office if different than above:

| | | , Michigan | |
|---|---|---|---|
| (P.O. Box or Street Address) | (City) | | (Zip Code) |

**ARTICLE V** (Insert any desired additional provision authorized by the Act; attach additional pages if needed.)

Signed this 11th day of May 2012

By _____
(Signature(s) of Organizer(s))

W. Edwin Small
(Type or Print Name(s) of Organizer(s))

# EXHIBIT B

## (Dallas Articles of Organization)

# *Michigan Department of Licensing and Regulatory Affairs*

## *Filing Endorsement*

*This is to Certify that the ARTICLES OF ORGANIZATION (DOMESTIC L.L.C.)*

*for*

*DALLAS INTERNATIONAL L.L.C.*

*ID NUMBER: D6345U*

*received by facsimile transmission on July 21, 2011 is hereby endorsed*

*Filed on July 25, 2011 by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 25TH day of July, 2011.*

*Director*

**Bureau of Commercial Services**

BCS/CD-700 (Rev. 05/10)

# MICHIGAN DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH
# BUREAU OF COMMERCIAL SERVICES

| Date Received | (FOR BUREAU USE ONLY) |
|---|---|
| | |

This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.

Name
John P. Kelly

Address
422 E. Main Street

| City | State | ZIP Code |
|---|---|---|
| Northville | MI | 48167 |

EFFECTIVE DATE:

↻ Document will be returned to the name and address you enter above. ↺
If left blank, document will be returned to the registered office.

## ARTICLES OF ORGANIZATION
## For use by Domestic Limited Liability Companies
(Please read information and Instructions on reverse side)

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

**ARTICLE I**

The name of the limited liability company is: Dallas International, L.L.C.

**ARTICLE II**

The purpose or purposes for which the limited liability company is formed is to engage in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan.

**ARTICLE III**

The duration of the limited liability company if other than perpetual is: _____

**ARTICLE IV**

1. The name of the resident agent at the registered office is: Wm. Edwin Small

2. The street address of the location of the registered office is:

   10559 Citation Drive, Ste. 204, Brighton _____, Michigan  48116
   (Street Address)                                (City)                              (Zip Code)

3. The mailing address of the registered office if different than above:

   _____, Michigan _____
   (P.O. Box or Street Address)          (City)                              (Zip Code)

**ARTICLE V** (Insert any desired additional provision authorized by the Act; attach additional pages if needed.)

Signed this ___10___ day of ___JANUARY___, 2011

By ___W21___
(Signature(s) of Organizer(s))

Wm. Edwin Small, Managing Member
(Type or Print Name(s) of Organizer(s))

# EXHIBIT C

## (Debt Resolution Agreement)

## OBLIGATION RESOLUTION AGREEMENT

This Obligation Resolution Agreement (this "*Agreement*") is entered into as of the Execution Date (defined below) but made effective for all purposes as of January 27, 2022 (the "*Effective Date*"), by and among OXFORD BANK, a Michigan banking association ("*Bank*", "*Oxford Bank*" or "*Oxford*"), and DALLAS INTERNATIONAL, L.L.C., a Michigan limited liability company ("*Dallas International*"), SCC SERVICES, LLC, a Michigan limited liability company ("*SCC Services*"), SCC HOLDINGS, LLC, a Michigan limited liability company ("*SCC Holdings*"), GREGORY L. BOLLER ("*Boller*"), and BRIAN J. JENKS ("*Jenks*", and together with Dallas International, SCC Services, SCC Holdings and Boller, the "*Borrower Parties*"). W. Edwin Small and Karen Small join this Agreement as parties, as more fully set forth herein.

### Recitals and Definitions:

A. On August 31, 2020, Oxford Bank and Dallas International entered into a Business Loan Agreement (Amended and Restated) with respect to a loan from Oxford Bank to Dallas International (the "*Loan*").

B. On August 31, 2020, Dallas International executed a Promissory Note (Amended and Restated) ("*Note*") in favor of Oxford Bank.

C. On August 31, 2020, in connection with and as security for the Loan, Dallas International executed a Pledge, Control and Security Agreement ("*Pledge*").

D. On August 31, 2020, in connection with and as security for the Loan, Dallas International executed a Security Agreement ("*Security Agreement*").

E. On August 31, 2020, Boller executed a Continuing Guaranty Agreement (the "*Boller Guaranty*") guaranteeing Dallas International's indebtedness to Oxford Bank.

F. On August 31, 2020, Jenks executed a Continuing Guaranty Agreement (the "*Jenks Guaranty*") guaranteeing Dallas International's indebtedness to Oxford Bank.

G. On August 31, 2020, SCC Services executed a Continuing Guaranty Agreement (the "*SCC Services Guaranty*") guaranteeing Dallas International's indebtedness to Oxford Bank.

H. On August 31, 2020, SCC Holdings executed a Continuing Guaranty Agreement (the "*SCC Holdings Guaranty*") guaranteeing Dallas International's indebtedness to Oxford Bank.

I. The Note was amended on February 23, 2021 via a First Amendment to Promissory Note, on March 26, 2021 via a Second Amendment to Promissory Note, and on May 4, 2021 via a Third Amendment to Promissory Note (the Note, as amended is hereinafter referred to as the "*Note*").

J. The Business Loan Agreement, Note (including Amendments), Boller Guaranty, Jenks Guaranty, Pledge, Security Agreement, and all other documents, instruments and agreements executed in connection with the Loan are collectively referred to as the "*Loan Documents*."

K. Oxford has complied with the terms and conditions of the Loan Documents.

L. The Note, as amended, matured on July 5, 2021, and all indebtedness from Borrower and Guarantors to the Bank became due on such date.

M. Borrower Parties defaulted under their obligations to Oxford Bank by failing to pay the Loan when due.

N. The principal, interest and late charges due on the Loan as of January 7, 2022, is $1,347,224.26. the foregoing sum is exclusive of Bank's costs and expenses, including legal fees and continuing interest.

O. On January 25, 2022, Bank filed suit against Borrower Parties in the Livingston County Circuit Court, Case No. 2022-31375-CB (the "*Litigation*").

P. Borrower Parties have requested that Bank forbear from taking action with regard to default of the Loan, and Bank has agreed to such further forbearance, subject to the terms and conditions of this Agreement.

### Agreements:

1. <u>Recitals</u>. The above recitals are hereby incorporated herein by reference.

2. <u>Acknowledgment of Default</u>. Borrower Parties acknowledge and agree that Borrower Parties are in default of the Loan as a result of their failure to pay Oxford Bank in accordance with the terms thereof, as noted hereinabove (the "**Declared Default**").

3. <u>Forbearance Period</u>. Subject to Borrower Parties' strict and timely compliance with the terms of this Agreement, Oxford Bank agrees to forbear from taking action with regard to the Declared Default until December 31, 2026 (the "*Forbearance Period*"), subject to compliance by Borrower Parties with the terms, conditions, representations and warranties and other agreements set forth in this Agreement.

4. <u>Additional Guarantors</u>. Concurrent with the execution of this Agreement:

   a. W. Edwin Small ("*Ed Small*") shall execute the Continuing Guaranty Agreement attached hereto as <u>Exhibit A</u> (the "*Ed Small Guaranty*"). There shall be no limitations to the Ed Small Guaranty.

   b. Karen Small shall execute the Continuing Guaranty Agreement attached hereto as <u>Exhibit B</u> (the "*Karen Small Guaranty*"). The Karen Small Guaranty is available to pursue after the earlier of (a) 30 calendar days after a Judgment is obtained against Dallas International, LLC, SCC Holdings, LLC, SCC Services, LLC, Brian Jenks, Greg Boller, and/or Ed Small ("*Other Borrower Parties*"), (b) the death or dissolution of any of the Other Borrower Parties, (c) if any of the Other Borrower Parties file for bankruptcy protection (or is/are subject to an involuntary bankruptcy proceeding which is not dismissed within 60 days), or (d) any combination of (a), (b) or (c).

5. <u>Additional Security</u>. Borrower Parties, Ed Small, and Karen Small all hereby grant and convey to Oxford Bank a security interest in certain restricted stock of Great Elm Capital Corp. ("*GECC*"). The pledgors shall execute a Security Agreement on the Bank's standard form with respect to the GECC restricted stock (<u>Exhibit C</u>). The Borrower Parties, Ed Small and Karen Small shall cause, within 10 days following the Execution Date, for a control agreement (and/or other similar agreements) to be executed in order to perfect the security interest in the GECC stock.

2

6. **Litigation.** Subject to Borrower Parties' strict and timely compliance with the terms of this Agreement:

   a. Concurrent with the execution of this Agreement, Oxford Bank shall cause its counsel in the Litigation to submit a voluntary order of dismissal without prejudice to the Court in which the Litigation is pending (Exhibit D).

   b. Concurrent with the execution of this Agreement, Oxford Bank and the Borrower Parties shall stipulate to and execute the Stipulated Order for Reinstatement and for Entry of Consent Judgment in the form attached as Exhibit E hereto (the *"Consent Judgment"*). The Consent Judgment shall be held by counsel for Oxford Bank and be treated as provided herein. In the event of a Default by Borrower Parties, subject to any applicable cure period, Oxford Bank's counsel shall be authorized to submit the Consent Judgment to the Court for entry.

7. **Payments.** Borrower Parties shall cause all sums owed under to Oxford Bank under the Loan to be paid as follows:

   a. The Loan Documents shall govern all indebtedness of the Borrower Parties to Oxford Bank, except as modified herein *(as to interest and repayment provisions)*.

   b. Absent a default, interest shall, from and after February 1, 2022, accrue at the rate of 2.25% per annum.

   c. Borrower Parties shall cause a one-time payment of $8,900 to be made to Oxford Bank on the Execution Date.

   d. Borrower Parties shall cause monthly payments of $8,941.91 each to be made to Oxford Bank, with the first such payment being due on March 1, 2022, and all subsequent payments being due on the first day of each month thereafter until December 1, 2026.

   e. Borrower Parties shall cause additional yearly payments of $150,000 each to be made to Oxford Bank, on August 15, 2022, August 15, 2023, August 15, 2024, August 15, 2025 and August 15, 2026.

   f. All other sums due to Oxford Bank under the Loan shall be paid to Oxford Bank on or before December 31, 2026 (the *"New Maturity Date"*).

   All payments shall be made to Oxford Bank via federal wire transfer or check. Payments are deemed made when received by the Bank, not when mailed.

8. **Attorney Fees and Costs.** Borrower Parties shall reimburse Bank for any and all fees, recording fees, filing fees, costs and expenses including, without limitation, reasonable attorneys' fees incurred or paid by Bank in connection with the Loan and this Agreement.

9. **Reporting Requirements.** Borrower Parties, Ed Small and Karen Small shall furnish Bank, within fourteen (14) days following a request by Bank, with the items specified below, in form and detail reasonably satisfactory to Bank:

   a. Copies of federal and state tax returns, including all K-1's and other supporting schedules;

W:\DATA\CLDOCS\07943\0007\02853124.DOC

b. Financial statement(s) (personal financial statement, balance sheet, income statement, etc.);

c. Copies of bank statements and ledgers; and

d. Any other financial documentation requested by the Bank.

10. Representations. Borrower Parties, Ed Small and Karen Small represent and warrant to Bank that:

a. Other than the Declared Default, no other defaults exist under the Loan Documents and no circumstances exist that with the passage of time, the giving of notice, or both, could constitute a default under the Loan Documents.

b. All corporate resolutions and other authority documents delivered to Bank relative to borrowing money, pledging collateral, and guaranteeing indebtedness remain in full force and effect.

c. All financial information of Borrower Parties delivered to Bank heretofore or hereafter is correct and complete in all material respects and accurately represents the financial condition of Borrower Parties.

d. Borrower Parties have duly authorized and validly executed and delivered this Agreement.

e. No proceedings in bankruptcy or receivership have been instituted by or against Borrower Parties, nor have Borrower Parties made any assignment for the benefit of creditors.

f. There are no judgments against Borrower Parties or any garnishment, attachment or other levy against Borrower Parties or its property.

g. There are no actions, suits, or proceedings pending or, to the knowledge of Borrower Parties, threatened against or affecting Borrower Parties or any property of Borrower Parties, in any court or before any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

h. There is no state or Federal tax lien or any other state or Federal lien of any kind or nature that could constitute a lien or charge against the collateral, other than real property taxes.

i. There are no liens, leases, options to purchase, purchase agreements, or other agreements that encumber the collateral, except in favor of Bank or previously disclosed in writing to, and approved by, Bank.

j. The foregoing representations and warranties shall be true and correct as of the Effective Date and at all times during the Forbearance Period.

11. Forbearance. Unless an Event of Default occurs, Bank shall forbear from exercising its right to immediately foreclose its lien upon and security interests in the Collateral and otherwise enforce its rights under the Loan Documents. Borrower Parties acknowledge and agree that this

4

Agreement is merely a temporary delay on the part of Bank in exercising its rights and remedies under the Loan Documents only during the Forbearance Period and only if there is no Event of Default.

12. Event of Default. For purposes of this Agreement "**Event of Default**" means any one (1) of the following events:

   a. Failure to make any payment under this Agreement on or before its due date. For payment defaults, the Bank shall (but not more than two times per calendar year) provide a written notice and afford an opportunity to cure within 10 days of when due.

   b. Failure to comply with any of the terms, conditions or provisions of the Loan Documents or this Agreement (other than payments), which is/are not cured within thirty (30) days after delivery by Bank to Borrower Parties of written notice of such failure, except as to payments (which is provided for in the immediately preceding paragraph) or the expiration of the Forbearance Period, for which no notice or cure period shall apply, except as otherwise stated.

   c. A breach of any warranty, representation or covenant set forth in this Agreement or the Loan Documents.

   d. Proceedings under the Bankruptcy Code or other bankruptcy, reorganization, readjustment of debt, insolvency, dissolution, liquidation, or other similar law of any jurisdiction or otherwise are instituted by or against any Borrower Parties, Ed Small or Karen Small; or (ii) Proceedings for the appointment of a receiver, trustee or liquidator of any Borrower Parties, Ed Small or Karen Small is instituted by or against any Borrower Parties, Ed Small or Karen Small, which proceedings are not set aside or dismissed within 60 days of filing.

   e. Any attachment, garnishment, execution, levy or similar process in excess of $50,000.00 shall at any time be placed upon any assets of any Borrower Parties, Ed Small or Karen Small.

   f. Any judgment in excess of $50,000.00 is entered against any Borrower Parties, Ed Small or Karen Small.

   g. Any statement, representation or information made or furnished by or on behalf of Borrower Parties, Ed Small or Karen Small to Bank in connection with or to induce Bank to enter into this Agreement shall prove to be false in material respects or materially misleading when made or furnished.

   h. The death, dissolution, merger, consolidation, termination of existence, insolvency, or assignment for the benefit of creditors of any of the Borrower Parties, Ed Small or Karen Small.

13. Effect of Event of Default; Remedies. Upon the occurrence of any Event of Default, Bank reserves its rights to prosecute its claims, including the right to accelerate all indebtedness and be entitled to immediate payment of the entire amount of all sums due to Bank. Further, Bank's obligation to forbear from the exercise of its rights and remedies shall immediately terminate without further notice or opportunity to cure. In particular, Bank may immediately exercise singularly, consecutively and cumulatively, at such times, with such frequency and in such order

5

as Bank may elect, all of Bank's rights and remedies under this Agreement, the Loan Documents and at law or equity.

14. Agreement Controls. The Loan Documents are incorporated herein by reference. This Agreement is intended to amend the terms of the Loan Documents. If there is any express conflict between the terms and provisions of the Loan Documents and those contained in this Agreement, the terms and provisions of this Agreement shall govern and control.

15. **Waiver of Trial by Jury. Bank, Borrower Parties, Ed Small and Karen Small acknowledge and agree that the right to trial by jury is a constitutional one, but that it may be waived. Each party, after consulting (or having had the opportunity to consult) with counsel of their choice, knowingly and voluntarily, and for their mutual benefit waives any right to trial by jury in the event of litigation regarding the performance or enforcement of, or in any way related to, this Agreement.**

16. Notice. All notices, requests, demands, and other communications under this Agreement shall be in writing and hand delivered, sent by nationally recognized overnight delivery carrier, or mailed (postage prepaid) by certified mail with return receipt requested, at the respective addresses set forth below or such other address as shall be designated in writing by such party. Any party may change that party's address by prior written notice to the other parties. Courtesy copies of notices may be sent by email. Notice shall be deemed given upon delivery or first refusal to accept delivery.

If to Borrower Parties:

Dallas International LLC
SCC Holdings, LLC
SCC Services, LLC
10559 Citation Drive, Suite 204
Brighton, Michigan 48116

Greg Boller
58756 Peters Barn Dr.
South Lyon, Michigan 48178

Brian Jenks
3290 W. Drahmer
Oxford, Michigan 48371

If to Ed Small:

W. Edwin Small
10589 Stoney Point
South Lyon, Michigan 48178

If to Karen Small:

Karen Small
10589 Stoney Point
South Lyon, Michigan 48178

.6

Oxford Bank
Attn. Bryan Ford
28345 Beck Road, Suite 206
Wixom, Michigan 48393

With a copy to:

Dawda, Mann, Mulcahy & Sadler, PLC
Attn. Alfredo Casab
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304

17. **Advice of Counsel.** Each party hereto acknowledges that it has had the advice of legal, accounting and other professional advisers or the opportunity to obtain such advice. Each party hereto has read and understands this Agreement and is executing this Agreement as the party's free act and without duress with the intent to be legally bound.

18. **Governing Law.** This Agreement shall be governed by the laws of the State of Michigan. Section headings are for reference only and have no substantive meaning.

19. **Entire Agreement.** The recitals, exhibits, and all Loan Documents are hereby incorporated and made a part of this Agreement. This Agreement contains the entire understanding and agreement between the parties relating to the subject matter of this Agreement and supersedes all prior agreements, negotiations or understandings between the parties relating to the subject matter of this Agreement.

20. **Time of Essence.** Time is of the essence with regard to each provision of this Agreement.

21. **Waivers and Forbearance.** Other than as expressly set forth in this Agreement, and notwithstanding Bank's willingness to forbear thus far, neither this Agreement nor any other written or verbal communication or action, nor any acceptance of any payments in an amount less than the amount due, by Bank is, nor should be construed as, a waiver of any defaults, claims, rights or remedies, or as a promise, agreement of representation of any kind, expressed or implied, on the part of Bank to make any other financial accommodation, or to continue to forbear, postpone or refrain from taking any action with respect to the Loan.

22. **Counterpart.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which all together constitute one and the same original. One or more counterparts may be delivered by facsimile or pdf, with the intention that they shall have the same effect as an original counterpart thereof.

The parties have executed this Agreement as of the date set opposite their respective signatures, the last of which shall be deemed the *"Execution Date."*

W:\DATA\CLDOCS\07943\0007\02853124.DOC

**BANK:**

**OXFORD BANK,**
a Michigan banking association

By: Bryan Ford
Its: Senior Vice President

February ____, 2022

**BORROWER PARTIES:**

DALLAS INTERNATIONAL, L.L.C.,
a Michigan limited liability company

By: _____
Its: _____

February ____, 2022

SCC SERVICES, LLC,
a Michigan limited liability company

By: _____
Its: _____

February ____, 2022

SCC HOLDINGS, LLC,
a Michigan limited liability company

By: _____
Its: _____

February ____, 2022

GREGORY L. BOLLER

_____
Gregory L. Boller

February ____, 2022

BRIAN J. JENKS

_____
Brian J. Jenks

February ____, 2022

8

<u>**BANK**</u>:

**OXFORD BANK,**
a Michigan banking association

By: Bryan Ford                                                   February ___, 2022
Its: Senior Vice President

<u>**BORROWER PARTIES**</u>:

DALLAS INTERNATIONAL, L.L.C.,
a Michigan limited liability company

By: BRIAN JENKS                                              February 1, 2022
Its: MEMBER

SCC SERVICES, LLC,
a Michigan limited liability company

By: W. Edwin Smith                                          February 1, 2022
Its: Member

SCC HOLDINGS, LLC,
a Michigan limited liability company

By: W. Edwin Smith                                          February 1, 2022
Its: Member

GREGORY L. BOLLER

Gregory L. Boller                                                February 1, 2022

BRIAN J. JENKS

Brian J. Jenks                                                    February 1, 2022

W. EDWIN SMALL

_____                    January ___, 2022
W. Edwin Small

KAREN SMALL

_____                    February ___, 2022
Karen Small

9

W. EDWIN SMALL

_____  
W. Edwin Small

January **31**, 2022

KAREN SMALL

_____  
Karen Small

February **1**, 2022

C:\Users\bjenks\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\QTLUS2VI\Obligation Resolution Agreement - 02-01-22 - 0147 pm - AC (02853083xAB04A).DOC

# EXHIBIT D

# (SCC Escrow Agreement)

# AMENDED AND RESTATED AGREEMENT

This Amended and Restated Agreement (this "*Agreement*") is made effective as of October 20, 2023 (the "*Effective Date*"), by and among OXFORD BANK, a Michigan banking association ("*Bank*", "*Oxford Bank*" or "*Oxford*"), SCC HOLDINGS, LLC, a Michigan limited liability company ("*SCC Holdings*"), BRIAN J. JENKS ("*Brian Jenks*"), GREG BOLLER ("Greg Boller"), W. EDWIN SMALL ("*Ed Small*") and KAREN SMALL ("*Karen Small*", and together with SCC Holdings, Brian Jenks, Greg Boller, and Ed Small, the "*Sterling Parties*").

*Recitals*

A.      The parties entered into a certain Agreement effective as of September 15, 2023. This Agreement amends and restates the Agreement effective as of September 15, 2023.

B.      As of the Effective Date, SCC Holdings (together with others) owes Oxford Bank the total sum of $798,953.33 (the "*Payoff Amount*") (*consisting of $766,195.04 in principal, $4,118.29 of accrued interest to the Effective Date, plus the balance of $28,622.00 for outstanding attorney's fees and costs*). The Payoff Amount assumes no further borrowing(s), protective advance(s), expense(s), or repayments of any other obligations at any time prior to or on or after the Effective Date. Interest shall continue to accrue until the actual payment to Oxford Bank, and costs (such as attorney's fees) shall continue to be the obligation of the Sterling Parties, and shall be added to the Payoff Amount on the date of the Transaction (defined below).

C.      SCC Holdings has a bank account open at Oxford Bank, bearing account number 3208278 (the "*Subject Account*").

D.      Not later than 4:00 pm, Eastern Time, on Wednesday, October 25, 2023 (the "*Deadline Cutoff*"), one or more (or all) of the Sterling Parties will cause a sale of certain collateral of Oxford Bank (the "*Collateral*") - more particularly, certain restricted stock of Great Elm Capital Corp. ("*GECC*") to a third party (the "*Transaction*"). The sale of that Collateral will generate proceeds of approximately $1,013,062 (but in no event less than the Payoff Amount) (the "*Sale Proceeds*"), which Sale Proceeds are to be deposited into the Subject Account.

E.      The Sterling Parties wish to authorize Oxford Bank to withdraw the Payoff Amount from the Subject Account, with the balance in the Subject Account following the payment of the Payoff Amount (the "*Excess Funds*") being restricted as more fully set forth in this Agreement.

F.      The parties wish to make certain agreements regarding the foregoing and other matters as more fully set forth herein.

Now, therefore, the parties agree as follows:

*Agreement*

1.      <u>Recitals</u>. The above recitals are hereby expressly incorporated herein by reference.

2.      <u>Payoff Amount</u>. The Sterling Parties agree and acknowledge that the Payoff Amount as of the Effective Date is correct.

3.      <u>Deposit and Consent to Transaction</u>. On or before the Deadline Cutoff, the Sterling Parties shall cause the Transaction to be consummated, and the Sale Proceeds to be deposited into the Subject

Account on the date of the Transaction. Oxford Bank consents to the Transaction, free and clear of its lien on the Collateral, provided that all of the Sale Proceeds are deposited into the Subject Account on the date of the Transaction.

4. <u>Payment to Oxford Bank</u>. Following the deposit of the Sale Proceeds into the Subject Account, Oxford Bank is hereby expressly authorized to (and shall): (a) withdraw the Payoff Amount (*and all other sums, such as accruing interest to the date of actual payment, plus attorney's fees and costs, if any additional sums are incurred*) from the Subject Account, and (b) file a discharge(s) of its security interest on the Collateral (or authorize GECC to do so). Notwithstanding anything contained in this Agreement to the contrary, if (a) the Transaction has not taken place on or before the Deadline Cutoff, and (b) the Sale Proceeds have not been deposited into the Subject Account on or before the Deadline Cutoff, any payoff letter issued by Oxford Bank shall be null and void and a new payoff letter must be obtained.

5. <u>Restriction of Excess Funds</u>.

    a. Following payment to Oxford Bank of the Payoff Amount (and all other sums due to Oxford Bank), the Excess Funds shall thereafter remain in the Subject Account, and may not be withdrawn except under the following conditions:

        i. Upon written instructions signed by all of: (i) Brian Jenks, (ii) Greg Boller, (iii) Ed Small, (iv) Karen Small, and (v) SCC Holdings (*signed by all of Brian Jenks, Greg Boller, Ed Small and Karen Small on its behalf*); or

        ii. Upon receipt by Oxford Bank of an order from a Court of competent jurisdiction, in a case in which SCC Holdings, Brian Jenks, Greg Boller, Ed Small and Karen Small are all parties, which constitutes a final determination as to the disposition of the Excess Funds. **Oxford Bank shall at all times have the right to seek instruction or clarification if a Court order leaves any reasonable doubt as to the finality or direction of the Court with respect to the Excess Funds (and such action shall be subject to Section 6 hereinbelow)**.

    b. In the event of a dispute as to the disposition of the Excess Funds, or at any time following twelve (12) months after the Effective Date, Oxford Bank is authorized to follow one of the following courses of action, which action Oxford Bank may (but shall not be obligated to) take at its sole and absolute discretion:

        i. Oxford Bank may file an interpleader action as provided by law. Upon depositing such monies held under this agreement with the Court, Oxford Bank shall be released from any further liability under this Agreement. It is understood and agreed that should Oxford Bank file an interpleader action, Oxford Bank shall be entitled to retain and/or deduct from the deposited monies (i.e., Excess Funds) its attorneys' fees and court costs incurred.

6. <u>Attorney Fees and Costs</u>. The Sterling Parties shall reimburse Oxford Bank for any and all fees, recording fees, filing fees, costs and expenses including, without limitation, reasonable attorneys' fees incurred or paid by Oxford Bank in connection with this Agreement, or any action taken or to be taken by Oxford Bank as permitted herein. Oxford Bank shall have a security interest in the Excess Funds (and all other funds of Borrower Parties held at Oxford Bank) as collateral for the obligations of the Borrower Parties hereunder.

2

7. <u>Release of Claims against Bank</u>. The Sterling Parties (jointly and severally) hereby waive, release Oxford Bank, its directors, officers, employees, attorneys and agents (collectively, the **"Released Parties"**), from and against any and all claims, causes of action, harm, injury and damage of any and every kind, known or unknown, legal or equitable, which any of the Sterling Parties have, or may claim to have, against Released Parties, from the date of any of the Sterling Parties' first contact with the Released Parties to the Effective Date.

8. <u>Agreement Controls</u>. Any and all loan documents and other agreements (including without limitation, the obligation resolution agreement) between or among Oxford Bank and any of the Sterling Parties is/are here incorporated by reference. This Agreement is intended to amend the terms of such loan documents. If there is any express conflict between the terms and provisions of the loan documents and those contained in this Agreement, the terms and provisions of this Agreement shall govern and control.

9. **<u>Waiver of Trial by Jury</u>. Oxford Bank and the Sterling Parties acknowledge and agree that the right to trial by jury is a constitutional one, but that it may be waived. Each party, after consulting (or having had the opportunity to consult) with counsel of their choice, knowingly and voluntarily, and for their mutual benefit waives any right to trial by jury in the event of litigation regarding the performance or enforcement of, or in any way related to, this Agreement.**

10. <u>Notice</u>. All notices, requests, demands, and other communications under this Agreement shall be in writing and hand delivered, sent by nationally recognized overnight delivery carrier, or mailed (postage prepaid) by certified mail with return receipt requested, at the respective addresses set forth below or such other address as shall be designated in writing by such party. Any party may change that party's address by prior written notice to the other parties. Courtesy copies of notices may be sent by email. Notice shall be deemed given upon delivery or first refusal to accept delivery.

<u>If to SCC Holdings</u>:

SCC Holdings, LLC
10559 Citation Drive, Suite 204
Brighton, Michigan 48116

<u>If to Brian Jenks</u>:

Brian Jenks
3290 W. Drahmer
Oxford, Michigan 48371

<u>If to Greg Boller</u>:

Greg Boller

_____

_____

<u>If to Ed Small</u>:

W. Edwin Small

_____

If to Karen Small:

Karen Small

_____

_____

If to Oxford Bank:

Oxford Bank
Attn. Bryan Ford
28345 Beck Road, Suite 206
Wixom, Michigan 48393

*With a copy to*:

Dawda, Mann, Mulcahy & Sadler, PLC
Attn. Alfredo Casab
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304

11.    Advice of Counsel.  Each party hereto acknowledges that it has had the advice of legal, accounting and other professional advisers or the opportunity to obtain such advice.  Each party hereto has read and understands this Agreement and is executing this Agreement as the party's free act and without duress with the intent to be legally bound.

12.    Governing Law.  This Agreement shall be governed by the laws of the State of Michigan. Section headings are for reference only and have no substantive meaning.

13.    Entire Agreement.   The recitals, exhibits, and all Loan Documents are hereby incorporated and made a part of this Agreement.  This Agreement contains the entire understanding and agreement between the parties relating to the subject matter of this Agreement and supersedes all prior agreements, negotiations or understandings between the parties relating to the subject matter of this Agreement.

14.    Time of Essence.  Time is of the essence with regard to each provision of this Agreement.

15.    Waivers and Forbearance.  Other than as expressly set forth in this Agreement, neither this Agreement nor any other written or verbal communication or action, nor any acceptance of any payments in an amount less than the amount due, by Oxford Bank is, nor should be construed as, a waiver of any defaults, claims, rights or remedies, or as a promise, agreement of representation of any kind, expressed or implied, on the part of Oxford Bank to make any other financial accommodation, or to continue to forbear, postpone or refrain from taking any action with respect to the loan(s).

16.    Counterpart. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which all together constitute one and the same original.   One or more counterparts may be delivered by facsimile or pdf, with the intention that they shall have the same effect as an original counterpart thereof.

Whereof, the parties have executed this Agreement as of the date set opposite their respective signatures, but effective for all purposes as of the Effective Date set forth in the opening paragraph of this Agreement.

**Oxford Bank**:

**OXFORD BANK,**
a Michigan banking association


October ____, 2023

_____
By: Bryan Ford
Its: Senior Vice President


**SCC Holdings**:

SCC HOLDINGS, LLC,
a Michigan limited liability company


October 18, 2023

_____
By: Brian Jenks
Its: authorized representative


October ____, 2023

_____
By: Greg Boller
Its: authorized representative


October ____, 2023

_____
By: W. Edwin Small
Its: authorized representative


October ____, 2023

_____
By: Karen Small
Its: authorized representative


*[Balance of this page intentionally left blank; signatures continue on the following page]*

5

Whereof, the parties have executed this Agreement as of the date set opposite their respective signatures, but effective for all purposes as of the Effective Date set forth in the opening paragraph of this Agreement.

**Oxford Bank**:

**OXFORD BANK,**
a Michigan banking association

_____     October ___, 2023
By: Bryan Ford
Its: Senior Vice President

**SCC Holdings**:

SCC HOLDINGS, LLC,
a Michigan limited liability company

_____     October ___, 2023
By: Brian Jenks
Its: authorized representative

_____     October 18, 2023
By: Greg Boller
Its: authorized representative

_____     October ___, 2023
By: W. Edwin Small
Its: authorized representative

_____     October ___, 2023
By: Karen Small
Its: authorized representative

*[Balance of this page intentionally left blank; signatures continue on the following page]*

5

Whereof, the parties have executed this Agreement as of the date set opposite their respective signatures, but effective for all purposes as of the Effective Date set forth in the opening paragraph of this Agreement.

**Oxford Bank**:

**OXFORD BANK**,
a Michigan banking association

October \_\_\_, 2023

_____
By: Bryan Ford
Its: Senior Vice President

**SCC Holdings**:

SCC HOLDINGS, LLC,
a Michigan limited liability company

October \_\_\_, 2023

_____
By: Brian Jenks
Its: authorized representative

October \_\_\_, 2023

_____
By: Greg Boller
Its: authorized representative

October \_\_\_, 2023

_____
By: W. Edwin Small
Its: authorized representative

October 16, 2023

_____
By: Karen Small
Its: authorized representative

*[Balance of this page intentionally left blank; signatures continue on the following page]*

5

**Brian Jenks**:

Brian J. Jenks

October 18, 2023

**Greg Boller**:

Greg Boller

October ___, 2023

**Ed Small**:

W. Edwin Small

October ___, 2023

**Karen Small**:

Karen Small

October ___, 2023

6

**Brian Jenks**:

_____     October ___, 2023
Brian J. Jenks

**Greg Boller**:

_____     October 18, 2023
Greg Boller

**Ed Small**:

_____     October ___, 2023
W. Edwin Small

**Karen Small**:

_____     October ___, 2023
Karen Small

**Brian Jenks**:

_____  October ___, 2023
Brian J. Jenks


**Greg Boller**:

_____  October ___, 2023
Greg Boller


**Ed Small**:

_____  October ___, 2023
W. Edwin Small


**Karen Small**:

_____  October 16, 2023
Karen Small

6

# EXHIBIT E

# (Arbitration Agreement)

## ARBITRATION AGREEMENT

THIS ARBITRATION AGREEMENT is entered into as of November 30, 2023, between and among SCC Holdings, LLC ("SCC"), Brian Jenks ("Jenks"), Greg Boller ("Boller"), Edwin Small ("E. Small") and Karen Small ("K. Small"), and SCC Holdings, LLC (collectively, the "Parties").

### Recitals

This Agreement is entered into with regard to the following facts:

A.      Jenks, Boller, E. Small and K. Small are all members in SCC; and

B.      Jenks, K. Small and E. Small are all currently managers of SCC; and

C.      A number of disputes have arisen among Jenks, E. Small, K. Small, Boller and/or SCC relating to SCC, including without limitation derivative claims that are or could be asserted by or in the right of SCC against any of its members or managers (the "Disputes"); and

D.      The Parties have agreed to utilize the procedures set forth in this Agreement to resolve the Disputes pursuant to a private Arbitration proceeding (the "Arbitration") pursuant to the terms and conditions below.

NOW THEREFORE, the Parties hereby agree as follows:

1.      The above facts are incorporated by reference.

2.      Sections 5.9, 9.1, 9.2, 9.3 and 9.4 of the SCC First Amended Operating Agreement, shall not apply to the Arbitration except as specifically set forth in this Agreement.

3.      The Parties hereby agree to conduct a private Arbitration of the Disputes and have agreed that Kenneth Neuman shall serve as the sole arbitrator (the "Arbitrator"). The Arbitrator shall have full and complete authority to adjudicate and resolve the Disputes and to issue a final award setting forth his determination. The final award of the Arbitrator shall be final and binding on all Parties and any Party may seek to confirm the final award issued at the conclusion of the

1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY      BJ_003539

Arbitration pursuant to MCR 3.602 and the Michigan Arbitration Act as amended in any Court of competent jurisdiction. All Parties hereby consent to and submit to personal jurisdiction in the Livingston County Circuit Court for the purpose of confirming the final Arbitration award.

4.      Enforcement of the Livingston County Circuit Court Order dated March 2, 2023, shall not be part of the Disputes subject to Arbitration under this Agreement and Judge Hatty shall retain jurisdiction to enforce the March 2, 2023 order.

5.      The Arbitration shall be held at the office of the Arbitrator or some other location agreed to by all Parties and need not be held in Livingston county.

6.      Discovery shall be allowed in the Arbitration as set forth in the Michigan Court Rules. Other than as to discovery, the Commercial Rules of the American Arbitration Association shall govern the Arbitration. The provisions of the Michigan Arbitration Act as amended shall also apply to the Arbitration.

7.      Each individual party shall be responsible for its pro rata share of the Arbitrator's fees based upon its ownership percentage in SCC: (Jenks 30%; K. Small 30%; E. Small 30%; Boller 10%).

8.      The Arbitrator shall be entitled to set a schedule for the Arbitration with input from the Parties.

9.      This Agreement and the Arbitration shall be governed by Michigan law.

10.     The Arbitrator shall issue a reasoned opinion within thirty (30) days after completion of the formal hearing which shall address all the claims of all the Parties subject to this Agreement.

Stipulated and Agreed:

_____          _____
Brian Jenks                      Greg Boller

(signatures continue on next page)

2

129616558v1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY      BJ_003540

of the Arbitration pursuant to MCR 3.602 and the Michigan Arbitration Act as amended in any Court of competent jurisdiction. All Parties hereby consent to and submit to personal jurisdiction in the Livingston County Circuit Court for the purpose of confirming the final Arbitration award.

4. Enforcement of the Livingston County Circuit Court Order dated March 2, 2023, shall not be part of the Disputes subject to Arbitration under this Agreement and Judge Hatty shall retain jurisdiction to enforce the March 2, 2023 order.

5. The Arbitration shall be held at the office of the Arbitrator or some other location agreed to by all Parties and need not be held in Livingston county.

6. Discovery shall be allowed in the Arbitration as set forth in the Michigan Court Rules. Other than as to discovery, the Commercial Rules of the American Arbitration Association shall govern the Arbitration. The provisions of the Michigan Arbitration Act as amended shall also apply to the Arbitration.

7. Each individual party shall be responsible for its pro rata share of the Arbitrator's fees based upon its ownership percentage in SCC: (Jenks 30%; K. Small 30%; E. Small 30%; Boller 10%).

8. The Arbitrator shall be entitled to set a schedule for the Arbitration with input from the Parties.

9. This Agreement and the Arbitration shall be governed by Michigan law.

10. The Arbitrator shall issue a reasoned opinion within thirty (30) days after completion of the formal hearing which shall address all the claims of all the Parties subject to this Agreement.

Stipulated and Agreed:

| _____ | _____ |
| Brian Jenks | Greg Boller |

2

129616558v1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY    BJ_003541

(signatures continue on next page)

_____          _____
Edwin Small                               Karen Small

SCC HOLDINGS, LLC

By: _____
By: _____
By: _____
Its: Managers

3

129616558v1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY      BJ_003542

_____  _____
Edwin Small                    Karen Small

SCC HOLDINGS, LLC

By: _____
By: _____
By: _____
Its:    Managers

3

129616558v1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY     BJ_003543

# FIRST AMENDMENT TO ARBITRATION AGREEMENT

THIS FIRST AMENDMENT TO ARBITRATION AGREEMENT is entered into as of December 21, 2023, between and among SCC Holdings, LLC ("SCC"), Brian Jenks ("Jenks"), Greg Boller ("Boller"), Edwin Small ("E. Small") and Karen Small ("K. Small"), and SCC Holdings, LLC (collectively, the "Parties").

## Recitals

This Agreement is entered into with regard to the following facts:

A. Jenks, Boller, E. Small, K. Small and SCC all entered into an arbitration agreement (the "Arbitration Agreement") dated on or about November 30, 2023; and

B. The Parties have entered into this First Amendment to Arbitration Agreement to add various terms to the Arbitration Agreement as stated herein.

**NOW THEREFORE, the Parties hereby agree as follows:**

1. The above facts are incorporated by reference.

2. The Arbitration Agreement remains in full force and effect.

3. The Parties agree that the fees of the Arbitrator shall be paid from the funds held in the name of SCC at Oxford Bank.

4. The Parties further agree that any claim or defense in the right of SCC may be asserted on its behalf in the Arbitration by any or all of Jenks, Boller, E. Small or K.Small, acting individually or jointly, and all procedural requirements for the assertion of any derivative claim or defense in the right of SCC shall be deemed satisfied.

Stipulated and Agreed:

_____
Brian Jenks

*Greg Boller*
_____
Greg Boller

(signatures continue on next page)

1

129616558v1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY    BJ_003544

_____
Edwin Small

SCC HOLDINGS, LLC

By: _____
By: _____
By: _____
Its: Managers

_____
Karen Small

129616558v1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER FOR USE IN PRIVATE ARBITRATION ONLY     BJ_003545

# EXHIBIT F

# (Arbitration Award)

**WILLIAM EDWIN SMALL**, an individual,

      Claimant/Counter-Respondent,

                                Arbitrator: Kenneth F. Neuman

v.

**BRIAN JENKS**, an individual**, GREG BOLLER**, an individual, and **SCC HOLDINGS, LLC**, a Michigan limited liability company,

      Respondents/Counter-Claimants,

                                                      /

| | |
|---|---|
| **FRANK & FRANK LAW** | **TAFT STETTINIUS & HOLLISTER, LLP** |
| Jonathan B. Frank (P42656) | R. Christopher Cataldo (P39353) |
| Janette E. Frank (P42661) | Benjamin M. Low (P82834) |
| 3910 Telegraph Road, Suite 200 | 27777 Franklin Road, Suite 2500 |
| Bloomfield Hills, MI 48302 | Southfield, MI 48034 |
| (248 723-8691 | (248) 351-3000 |
| jonfrank@frankandfranklaw.com | ccataldo@taftlaw.com |
| janfrank@frankandfranklaw.com | benlow@taftlaw.com |
| *Attorneys for Claimant/Counter-Respondent* | *Attorneys for Respondents/Counter-Claimants* |

                                                                /

## <u>ARBITRATOR'S FINAL AWARD</u>

Claimant Counter-Respondent W. Edwin Small ("Small") and Respondents Counter-Claimants Brian Jenks and Greg Boller (collectively "Respondents" and individually "Jenks" and "Boller") have each brought a number of derivative claims on behalf of SCC Holdings, LLC against the other before the undersigned as Arbitrator, all of which arise out of their membership interests in the company. The arbitration hearing was conducted over 4 days beginning on Monday, April 22, 2024 and concluding on Wednesday, May 1, 2024. Thereafter, the Parties submitted to the Arbitrator findings of fact and conclusions of law on May 16, 2024. Having

considered the testimony of the witnesses and the documentary evidence submitted, as well as the

law governing the Parties' conduct, the Arbitrator issues the following as his Final Award:

Claimant/Counter-Respondent W. Edwin Small ("Small"), Respondents/Counter-Claimants Brian Jenks ("Jenks") and Greg Boller ("Boller"), and non-party Karen Small ("Karen") are all Members of SCC Holdings, LLC ("SCC Holdings") and non-party SCC Services, LLC ("SCC Services"). Moreover, Small, Jenks and Karen are Managers of both entities. SCC Holdings and SCC Services are considered by all of the Parties to be treated as "one entity" for financial purposes as all Parties agreed that SCC Holdings was the "savings account" and SCC Services was the "checking account".

In February 2022, after almost ten years of business, SCC Holdings sold substantially all of its assets to Sterling Commercial Credit, LLC, an entity controlled by Great Elm Capital Corporation. The only assets retained by SCC Holdings was cash and the equity interests in Sterling Commercial Credit and Great Elm.

Contemporaneous with the sale to Great Elm, SCC Holdings' Operating Agreement was amended, which provided in part that going forward, any decision of the Managers required unanimous consent (the "Amended Operating Agreement").[1]

After the sale, Jenks, Boller, Small, and Karen all went to work for Sterling Commercial Credit. However, Small's employment ended shortly thereafter in April 2022.

## I. Small's Claims On Behalf of SCC Holdings Regarding Payments Approved by Respondents Jenks and Boller

Small maintains that there were a number of payments made by SCC Holdings to its creditors at the direction of Respondents Jenks and Boller (and Karen as co-manager) without his

---

[1] All Parties agreed that the initial Operating Agreement, effective May 15, 2012 (which was not introduced into evidence) required that the Managers could operate by a majority vote.

consent following the sale of SCC Holdings assets to Great Elm.  As these payments required unanimous consent of the Managers, Small maintains that these payments were in breach of the Amended Operating Agreement.  Based on the testimony of the Parties and Karen, it is clear that Jenks and Karen wanted to pay the creditors at issue, but that Small did not.  As such, given the unambiguous provision in the Amended Operating Agreement requiring the unanimous consent of the Managers, paying these creditors without Small's consent constitutes a breach of the Amended Operating Agreement.

However, the evidence also establishes that SCC Holdings was in a winding-up phase as of the time of these payments.  Specifically, because the Managers could not, or did not, agree on whether or not to pay one or more creditors, SCC Holdings was essentially in a deadlock scenario[2]. Under Michigan law, where a deadlock exists, the Michigan Limited Liability Act (the "Act") provides that a company should be winding-up and dissolved as "unable to carry on its business in conformity with the articles of organization or operating agreements." MCL 450.4802. "A trial court may be justified in ordering the dissolution of a limited liability company under this statute where there is evidence that the members are so deadlocked that the company is unable to carry on its business." *Jode Invs LLC v Burning Tree Props, LLC*, 2014 Mich App LEXIS 696, at *34 (Ct App, Apr. 17, 2014).  Under the Act, had SCC Holdings been formerly declared to be in a deadlock scenario, the Act would have required the company's creditors to be paid as a pre-condition to dissolution. MCL 450.4808(1)(a).

Thus, whether or not there was unanimous consent to pay, or not to pay, the creditors of SCC Holdings, the Arbitrator finds that the Managers were required by law to pay the creditors of SCC Holdings as part of a winding-up of its affairs.  Consequently, while Jenks and Boller (and

---

[2] Moreover, SCC Holdings was no longer an operating entity as its assets had been sold.

presumably Karen) breached the unanimous consent provision of the Amended Operating Agreement, the Arbitrator finds that there are no damages as a result of that breach, as the following creditors were required to be paid as a matter of law:

### i. *Payments to "Investors"*

Small alleges that Jenks improperly paid $87,324.44 to "investors" of SCC Holdings and Services. While no evidence was presented to establish the terms of these individuals' "investments", the uncontroverted evidence presented is that these "individuals" (including Small's family members) were paid money historically in consideration for their "investment" in SCC Holdings and that Respondents and Karen believed they were owed additional money. Based on the evidence presented, the Arbitrator finds that these "investors" were creditors of SCC Holdings and that the payments to them were required by law.

### ii. *Payments to Baker Tilly*

Small claims that Jenks improperly caused SCC Holdings to pay Baker Tilly $55,200 for accounting services. However, The Arbitrator finds that the Baker Tilly invoices were issued for services performed for the benefit of SCC Holdings (or SCC Services) and that SCC Holdings was required by law to pay for the services rendered.

### iii. *Payment to Tom Siska*

Small alleges that Jenks improperly caused SCC Holdings to pay $25,000 to Tom Siska. However, there was a signed contract obligating SCC Holdings to pay Mr. Siska (signed by Small on behalf of SCC Holdings). Because SSC Holdings was contractually obligated to make this payment, the Arbitrator finds the payment was proper as a matter of law.

4

### iv. *Miscellaneous Payments*

Small claims that Jenks improperly paid $18,128.16 in miscellaneous expenses for SCC Holdings and SCC Services without Small's consent. At the arbitration hearing, Jenks credibly testified that these payments were for small dollar amounts, such as electric bills that were incurred in the ordinary course of business. The Arbitrator finds Jenks' testimony credible and finds that these obligations were the responsibility of SCC Holdings.

### v. *California and Ohio Litigation Payments*

Small claims that Jenks improperly paid legal fees in the amounts of $11,000 and $7,500 in California and Ohio, respectively, for litigation against SCC Holdings' related companies. As SCC Holdings entered into retainer agreements with both law firms for legal services, and the law firms would be creditors of SCC Holdings, the Arbitrator finds that the obligations were those of SCC Holdings and the payments were proper.

### vi. *Bank Charges Owed by Dallas International*

Small claims that Jenks improperly authorized payment in the amount of $5,025.49 for bank charges owed by Dallas. SCC Holdings was the guarantor for Dallas on its loan to Oxford Bank. Therefore, because SCC Holdings would have been liable for these payments, the Arbitrator finds that these payments were proper.

### vii. *PITTS America Payments*

Finally, Small alleged that Jenks improperly paid $38,027.50 to PITTS America. PITTS was a customer of Dallas. The payments made by SCC Holdings at Respondents' direction was done after PITTS threatened litigation for a return of overpayments PITTS had made.

The evidence presented establishes that Small had manipulated the books of Dallas and had wrongfully written off this obligation and if not repaid, Dallas would have been liable for it. Given

i) that Dallas had no independent funds to repay PITTS, other than to borrow the money from its lender Oxford Bank, and ii) that SCC Holdings was the guarantor on the Dallas loan from Oxford Bank and ultimately responsible for the bank debt, the payment by SCC Holdings to PITTS was proper.

**II. Jenks and Boller's Claims On Behalf of SCC Holdings Against Small Regarding Expenses He Authorized, or Monies He Received, from SCC Holdings.**

### *i.* *The Ferrari*

In July 2017, Small caused SCC Holdings to purchase a Ferrari from Naples Motorsports where title was vested in the name of the company (Exhibit 1).[3] In July 2022, Small caused SCC Holdings to sell the Ferrari, and received a check from the purchaser issued to SCC Holdings in the amount of $99,500.

Rather than deposit the check into an existing SCC Holdings checking account, Small opened a new bank account in the name of SCC Holdings with the Bank of Ann Arbor and deposited the $99,500 in proceeds into the new bank account. He then caused a payment to be made in the amount of $49,500 to Karen (as part of their divorce settlement). As for the remaining $50,000, Small caused those funds to be paid to himself. When questioned, Small admitted he kept the money and justified his actions as "it was a very turbulent time". Moreover, the evidence establishes that Small's actions in selling the Ferrari, opening the bank account and paying the proceeds to Karen and himself were all done without the other Members' knowledge or consent.

Based on the forgoing, the Arbitrator finds that Small's retention of the $50,000 from the proceeds from the sale of the Ferrari was an act of conversion. The Ferrari was titled in the name of SCC Holdings and the proceeds from the sale of the car belonged to the company. Statutory conversion is "any distinct act of dominion wrongfully exerted over another's personal property

---

[3] While the paperwork at times referred to the transaction as a car lease, the Arbitrator finds it was a purchase.

in denial of or inconsistent with his rights therein" and when that property is converted for the defendant's "own use." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 351-52, 354-57 (2015). A person who is found to have stolen, converted, or embezzled another's personal property is liable for treble damages. MCL 600.2919a. The Arbitrator finds that Small violated the conversion statute and is liable to SCC Holdings for treble damages in the amount of **$150,000.00**.

Furthermore, Small is liable to SCC Holdings for the $49,500 he used from the sale of the Ferrari to assist him in his divorce settlement with Karen. Karen testified that she did not know the source of the $49,500 at the time payment was made to her, and only learned the source of those funds much later. The Arbitrator finds Karen's testimony credible and finds no wrongdoing on her part. However, based on the forgoing, the Arbitrator finds that Small's payment of these funds to Karen was a breach of his fiduciary duties owed to SCC Holdings and is liable to the company for $**49,500**.

Notwithstanding the forgoing, the Arbitrator finds that the monthly "lease" payments[4] for the Ferrari were disclosed on the books and records of the company, and Jenks and Boller knew or should have known these payments were being made. Given that there were years when they could and should have objected if they thought these payments were improper, the Arbitrator finds that any allegation of wrongdoing related to these payments was waived.

### ii.     *The September 2018 Distribution*

Respondents allege that in September 2018, Small took $40,000 in excess distributions as compared to other Members. As a general rule, distributions to members are generally acceptable

---

[4] While the Ferrari was actually a purchase, where title to the vehicle was in the name of SCC Holdings, the documentation characterized the transaction as a lease and the monthly payments were referred to as lease payments.

and contemplated by the Amended Operating Agreement. See § 3.4. The Operating Agreement required that distributions were made consistent with ownership of SCC Holdings. § 3.4. While there were no similar distributions made to the other Members at the time of this payment, Respondents have not met their burden of proof to show that Small received disproportionate distributions as compared to the other Members. As such, based on the record, the Arbitrator cannot find that this payment (or that the other monies allegedly paid to Small as improper distributions) were "excess distributions".[5]

### iii.      *July 2019 Payment*

In July 2019 Small caused SCC Holdings to wire himself $15,000 for his "personal account". This was an improper payment under the Operating Agreement, as there is no proof it was unanimously authorized by the Members or payment as a "distribution". The Arbitrator finds that Small is liable to SCC Holdings for this **$15,000**.

### iv.      *The Down Payment for 10152 Grand River*

In March 2021, Small purchased a building located at 10152 Grand River Ave through an entity he owned, GEMK Holdings. Small used SCC Holdings' funds to pay a $25,000 down payment on the property.

The Arbitrator finds that utilizing SCC Holdings' money to purchase an asset owned by an entity other than SCC Holdings constitutes an act of embezzlement. By taking the $25,000 for a down payment on a building that was solely for his personal benefit, Small embezzled money for his own use (MCL 750.174) and is liable for embezzlement, including treble damages, in the total amount of **$75,000**. MCL 600.2919a.

---

[5] Without the financial statements being produced, or other financial records establishing the Members' capital accounts, it is not possible for the Arbitrator to conclude (by a preponderance of the evidence) whether anyone received disproportionate distributions.

### v. *The Alleged Investment for Mavrick Small*

In June 2020, Small withdrew $50,000 out of SCC Holdings that he claims was given to his college-aged son, Maverick, for him to invest. However, the evidence presented established that the $50,000 was withdrawn from an SCC Holdings account and paid to Small's personal bank account—not to his son. Despite every opportunity to do so, no evidence was presented that i) those funds were ever tendered to Maverick, ii) the funds were ever invested (by Maverick or anyone else) or iii) whether the alleged investments were a "total loss" as claimed. As such, the Arbitrator finds that this payment was another act of embezzlement by Small and is liable to SCC Holdings for treble damages in the amount of **$150,000**. MCL 750.174; MCL 600.2919a.

### vi. *Lifestyle Limo*

Respondents allege that, starting in June 2019, Small utilized SCC Holdings funds to pay $66,250.00 for Lifestyle Limo, a company that Small owned. However, as with the lease payments for the Ferrari, the payments to Lifestyle Limo were all accounted for and disclosed in SCC Holdings' books and records. As such, Respondents knew or should have known of these payments (Exhibit 24 and 512). Given that there were years when Respondents could and should have objected if they thought these payments were improper, the Arbitrator finds that any allegation of wrongdoing related to these payments was waived.

### vii. *August 2019 Personal Taxes*

Respondents allege that in August 2019 Small took an unauthorized payment of $6,700 for his "personal taxes." Small has stated that this was a common practice by SCC Holdings or SCC Services for its Members. The Arbitrator finds that Respondents did not meet their burden of proof to show whether or not this was an unauthorized payment.

### viii.      *Painting of 10152 Grand River*

Respondents also allege that Small improperly caused SCC Holdings to pay $11,550.00 for interior painting of the GEMK building at 10152 Grand River.  However, the Respondents have failed to establish by a preponderance of evidence that this was an improper expense, as the premises being painted was office space that SCC Holdings had contracted to lease and ultimately moved into.  Based on the forgoing, the Arbitrator does not find any breach as to this claim.

### ix.      *Rent Payments for 10152 Grand River*

Similarly, Respondents allege that Small wrongfully caused SCC Holdings to pay GEMK $37,000 in rent payments for office space located at 10152 Grand River, as the rent payments started in June 2021, but SCC Holdings did not move into the space until November 2021. However, the lease produced by Respondents provides that SCC Holdings agreed to the monthly payments starting in June 2021, (Exhibit 13). Furthermore, to the extent that Respondents objected to the lease payments commencing before SCC Holdings took possession of the leased premises, they had every opportunity to inspect the Lease as members or managers of SCC Holdings.  Based on the forgoing, the Arbitrator does not find a breach as to this claim.

### x.      *American Express Payments*

Respondents also argue that Claimant Small must repay SCC Holdings $291,056.97 for American Express charges paid by the company that had been charged to Karen's company credit card.  Respondents allege these charges were Claimant's personal expenses and should not have been paid by SCC Holdings. Claimant argues the payments were part of his compensation package.

While Small maintains that he had the right to pay himself whatever he wanted in the form of personal expenses being run through the company, every other witness testified to the contrary. Moreover, Small does not dispute that the expenses were personal in nature.  Given this, had these

expenses been approved as "additional compensation" by Respondents and the company, they would have been reported as additional compensation on his W-2 or treated as a distribution on the books of the company. Instead, they were accounted for as "interest expense" or "interest expense-ES" and improperly deducted as business expenses. Based on the evidence presented, and the law, the Arbitrator concludes that these were not additional compensation to Small, but were rather payments made for the benefit of Small that were intentionally concealed from Respondents (and Karen) for which Small is liable.

However, to the extent any of these payments more than 6 years prior to the filing of the Statement of Claim, they are time barred. See Exhibits 130-138, 140-141. Therefore, the Arbitrator finds that Small is liable to SCC Holdings for those improper payments he caused to be made by the company within the last 6 years (from the date of Respondents' Statement of Claim) in the amount of **$220,088.52**.

### xi. *Oxford Bank Loan*

Respondents argue that Claimant is responsible for causing SCC Holdings to pay $1,747,224.26 to Oxford Bank (the "Oxford Debt"). Oxford Bank loaned money to Dallas, which in turn loaned that money to Fraternite d/b/a Ganwood d/b/a St. John's Sod Farm. Exhibit 67. The loan to Dallas was guaranteed by SCC Holdings. Dallas in turn defaulted on its loan to Oxford Bank. In order to resolve the debt, SCC Holdings, SCC Services, Jenks, Boller, and Dallas entered into a Debt Obligation Resolution Agreement. (Exhibit 65). Respondents argue that Small is liable for the Oxford Debt paid for by SCC Holdings under a theory of common law indemnification. Specifically, had Claimant not engaged in self-dealing, SCC Holdings would not have had to pay off the Oxford Debt.

However, Jenks and Boller consented to the Debt Obligation Resolution Agreement, and agreed to have SCC Holdings guaranty the Oxford Bank debt. Therefore, any claim that SCC Holdings should not have been liable for this debt was waived by their consent to the Debt Obligation Resolution Agreement. Accordingly, the Arbitrator does not find any liability as to this issue.

### xii. Statute of Limitations Bars certain claims related to the Porche, The Pool Guy, and the Hidden Lake REIT Investment

The Statute of Limitations for breach of contract is 6 years. MCL 600.5807. As Managers of SCC Holdings, Respondents Jenks and Boller had access to the books and records of SCC Holdings which disclosed a number of the expenditures to which Respondents complain. Based on the Statute of Limitations, the following claims are time barred:

1. Respondents could have discovered SCC Holdings' purchase of the Porche in December 2014 as the payments were disclosed in the books and records of the company and Respondent Boller was included on the email from Small regarding the payment. Exhibit 31.

2. Respondents could have discovered the use of $20,000 of SCC Holdings' funds paid to "The Pool Guy" in April 2014 which payment was disclosed in the books and records of the company.

3. Respondents could have discovered the payment from SCC Holdings of $45,000 in March 2017 for the Hidden Lake REIT. The evidence presented was that the payment was disclosed in the books and records of the company.

## III. The Marital Home Funds Deposits

Finally, Small continues to argue in this arbitration that the $411,000 he deposited into an SCC Holdings' bank account is his property ($425,000 less $14,000 that Small used to pay other

expenses). However, the Arbitrator has already ruled in his February 15, 2024 Opinion and Order that Small was not entitled to possession of these funds as they were paid into an SCC Holdings bank account based on a mistake of law. No evidence was presented at the hearing that contradicts this initial ruling and the Arbitrator finds that Claimant was mistaken about his legal ability to unilaterally withdraw funds from an SCC Holdings' bank account into which he voluntarily deposited funds.

## IV. DAMAGES AND AWARD

In summary, the Arbitrator;

a. renders an award of **Zero Dollars** in favor of SCC Holdings and against Jenks and Boller for the claims Claimant Small brought against them on behalf of SCC Holdings against;

b. renders an award of **$659,588.52** in favor of SCC Holdings and against Small for the counter-claims Respondents Jenks and Boller brought against Small on behalf of SCC Holdings; and

c. does not award costs or attorney fees against either party, as neither Claimant nor Respondents was the prevailing party.

IT IS SO ORDERED.

*/s/ Kenneth F. Neuman*_____
Kenneth F. Neuman (P39429)
Arbitrator

Dated: June 17, 2024

# EXHIBIT G

# (Order Affirming Arbitration Award)

FILED    Received for Filing    Oakland County Clerk    7/19/2024 11:03 AM

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND
BUSINESS COURT

WILLIAM EDWIN SMALL,

    Plaintiff,

                                          Case No. 24-205954-CB
v                                         Hon. Michael Warren

OXFORD BANK, et al.,

    Defendants.

_____/

**OPINION & ORDER DENYING EDWIN SMALL'S
MOTION TO VACATE ARBITRATION AWARD
& CONFIRMING THE ARBITRATION AWARD**

At a session of said Court, held in the
County of Oakland, State of Michigan
July 19, 2024.

PRESENT:  HON. MICHAEL WARREN

_____/

## OPINION

### I
### Overview

Before the Court is Edwin Small's Motion to Vacate Arbitration Award. Although technically awarding counter-relief of confirming the Arbitration Award is unusual without a separate motion seeking such relief, because the issues are fully joined in the instant Motion and Response, the Court addresses the Intervening Defendants' Jenks and Boller's  (the "Defendants") request for confirmation of the

corrected award.[1] Having carefully considered and reviewed the parties' submissions and being otherwise duly apprised in the premises, oral argument is dispensed pursuant to MCR 2.119(E)(3) because it would not assist the Court in rendering a decision.

At stake is whether the award should be vacated when Small's arguments simply amount to a disagreement with the Arbitrator's factual findings? Because the answer is "no," the Arbitration Award is confirmed.

## II
## Procedural Posture & Arguments

The parties agree that an arbitration was conducted, and the Arbitrator issued an award. Although cast as "legal errors," Small's arguments amount to dissatisfaction with the Arbitrator's factual findings and their application to the law. The Defendants argue that the Arbitration Award is well supported, and that Small is impermissibly attacking the factual findings of the Arbitrator.

## III
## Arbitration Standard of Review

The parties do not dispute that their arbitration was conducted pursuant to the Uniform Arbitration Act. Also undisputed is the applicability of MCR 3.602

---

[1] In other words, to require the Defendants to file their own motion for confirmation would simply needlessly increase the cost of litigation with no added benefit – all the issues have been exhaustively briefed. MCR 1.105.

[Arbitration] which governs statutory arbitration under MCL 691.1681 et seq. MCR 3.602(I) [Award; Confirmation by the Court] specifically provides that within 1 year after the award is rendered, the award may be confirmed by the court – unless it is vacated, corrected or modified, or postponed as provided elsewhere in the Rule. MCR 3.602(L) [Judgment] provides that "[t]he court shall render judgment giving effect to the award as corrected, confirmed, or modified. The judgment has the same force and effect, and may be enforced in the same manner, as other judgments." Thus, the Court Rules provide this Court with three options: it may confirm, modify or correct, or vacate the award. *Gordon Sel-Way, Inc v Spence Brothers, Inc,* 438 Mich 488, 496 (1991).

The Court's power to modify, correct, or vacate an arbitration award is "very limited." *Id.* The court's power to modify, correct, or vacate an arbitration award is limited by MCR 3.602(J)(2) and (K). Under MCR 3.602(J)(2), an arbitration award may be vacated if:

> (a) the award was procured by corruption, fraud, or other undue means;
> (b) there was evident partiality by an arbitrator, corruption by an arbitrator, or misconduct prejudicing a party's rights;
> (c) the arbitrator exceeded granted powers; or
> (d) the arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights.
>
> [MCR 3.602(J)(2).]

3

An arbitration award may be modified or corrected by motion filed within 91 days of the date of the award if:

> (a) there is evident miscalculation of figures or an evident mistake in the description of a person, a thing, or property referred to in the award;
> (b) the arbitrator has made an award with regard to a matter not submitted for arbitration and the award may be corrected without affecting the merits of the decision regarding the issues submitted; or
> (c) the award is imperfect in a matter of form, but the imperfection does not affect the merits of the controversy.
>
> [MCR 3.602(K)(2).]

"Judicial review of arbitration awards is limited." *Konal v Forlini*, 235 Mich App 69, 74 (1999). Michigan law has long held that "a general principle of arbitration precludes courts from upsetting an award for reasons that concern the merits of the claims." *Dohanyos v Detrex Corp,* 217 Mich App 171, 177 (1996), citing *Gordon Sel-Way,* 438 Mich at 500. Furthermore, "Courts may not engage in contract interpretation, which is a question for the arbitrator." *Konal,* 235 Mich App at 74 (citations omitted). Nor may courts review the arbitrator's factual findings because "[c]laims that the arbitrator made a factual error are beyond the scope of appellate review." *Id.* at 75 (citations omitted). Our Court of Appeals has elaborated:

> Judicial review of an arbitrator's decision is narrowly circumscribed. *Police Officers Ass'n of Michigan v Manistee Co,* 250 Mich App 339, 343 (2002). A court may not review an arbitrator's factual findings or decision on the merits. *Id.* Likewise, a reviewing court cannot engage in contract interpretation, which is an issue for the arbitrator to determine. *Konal v Forlini,* 235 Mich App 69, 74 (1999). Nor may a court substitute its

4

judgment for that of the arbitrator. *Gordon Sel-Way, Inc v Spence Bros, Inc,* 438 Mich 488, 497 (1991). "[H]ence [courts] are reluctant to vacate or modify an award when the arbitration agreement does not expressly limit the arbitrators' power in some way." *Id.* The inquiry for the reviewing court is merely whether the award was beyond the contractual authority of the arbitrator. *Police Officers Ass'n of Michigan, supra* at 343. If, in granting the award, the arbitrator did not disregard the terms of his or her employment and the scope of his or her authority as expressly circumscribed in the contract, "'judicial review effectively ceases.' " *Id.,* quoting *Lincoln Park v Lincoln Park Police Officers Ass'n,* 176 Mich App 1, 4 (1989). Thus, "'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,'" a court may not overturn the decision even if convinced that the arbitrator committed a serious error. *Michigan Ass'n of Police v City of Pontiac,* 177 Mich App 752, 760, quoting *United Paperworkers Int'l Union, AFL-CIO v Misco, Inc,* 484 US 29, 38; 108 S Ct 364; 98 L Ed 2d 286 (1987).

[*Ann Arbor v American Federation of State Co & Municipal Employees (AFSCME), Local 369,* 284 Mich App 126, 144-145 (2009).]

In other words, "[a] court may not review an arbitrator's factual findings or decision on the merits," may not second guess the arbitrator's interpretation of the parties' contract and may not "substitute its judgment for that of the arbitrator." *Ann Arbor v American Federation of State, Co, & Muni Employees (AFSCME) Local 369,* 284 Mich App 126, 144 (2009).

On motion by a party to an arbitration proceeding, a circuit court shall vacate an arbitration award where the arbitrator has exceeded his or her powers. MCL 691.1703(1)(d). See also MCR 3.602(J)(2)(c). "Arbitrators exceed their powers whenever they act beyond the material terms of the contract from which they draw their authority or in contravention of controlling law." *Miller v Miller,* 474 Mich 27, 30 (2005) citing

*DAIIE v Gavin*, 416 Mich 407, 433-434 (1982). However, a court "may not review the arbitrator's findings of fact and any error of law must be discernable on the face of the award itself." *Washington v Washington*, 283 Mich App 667, 672 (2009) (citations omitted). This means that "only a legal error that is evident without scrutiny of intermediate mental indicia will suffice to overturn an arbitration award. Courts will not engage in a review of an arbitrator's mental path leading to the award." *Id.* (quotation marks and citations omitted). Additionally, the error of law must be "so substantial that, but for the error, the award would have been substantially different." *Collins v Blue Cross Blue Shield of Mich*, 228 Mich App 560, 567 (1998) citing *Gordon Sel-Way*, 438 Mich at 497.

Claims of arbitrator error must be carefully evaluated to ensure that they are not being used "as a ruse to induce the court to review the merits of the arbitrator's decision." *Gordon Sel-Way*, 438 Mich at 497.

**IV**
**The Confirmation Award is Confirmed**

In the instant case, Small's protests boil down to impermissible attacks of the Arbitrator's factual determinations. The attempts to transmogrify disagreements over the facts into legal error is unpersuasive for the reasons articulated in the Defendants' Response. Moreover, to grant the relief requested would go to the merits of the claim, contract interpretation, and/or review the factual findings of the Arbitrator – all of

which are barred under binding Michigan jurisprudence. *Gordon Sel-Way,* 438 Mich at 500; *Dohanyos,* 217 Mich App at 177; *Konal,* 235 Mich App at 74.

Furthermore, Small does not even bother to present a transcript of the proceedings, thereby abandoning the argument. In essence, Small complains about the facts, but deprives this Court of the very record by which such an analysis would be possible. This Court need not scour a record to support Small's argument or just presume that the Motion is well grounded in exhibits never presented to the Court. *Barnard Mfg v Gates Performance,* 285 Mich App 362 (2009), citing *Carmen v San Francisco Unified School Dist,* 237 F3d 1026, 1031 (CA 9, 2001); *Adler v Wal-Mart Stores, Inc,* 144 F3d 664, 672 (CA 10, 1998) ("Thus, where the burden to present such specific facts by reference to exhibits and the existing record was not adequately met below, we will not reverse a district court for failing to uncover them itself"); *Forsyth v Barr,* 19 F3d 1527, 1537 (CA 5, 1994) (noting that vague and conclusory assertions that the evidence demonstrates a question of fact are insufficient-the nonmoving party must identify specific evidence in the record); *L S Heath & Son, Inc v AT & T Information Sys, Inc,* 9 F3d 561, 567 (CA 7, 1993) (concluding that "a district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment"); *Guarino v Brookfield Twp Trustees,* 980 F2d 399, 404 (CA 6, 1992) (stating that the appellants' "argument that the district court erred in not searching the record sua sponte is wholly without merit").

Accordingly, Small is not entitled to the relief sought; rather the Arbitration Award should be confirmed.

## ORDER

Based on the forgoing Opinion, Edwin Small's Motion to Vacate Arbitration Award is DENIED and the Arbitration Award is hereby CONFIRMED.

THIS ORDER RESOLVES THE LAST PENDING CLAIM AND CLOSES THE CASE.

/s/ Michael Warren

**HON. MICHAEL WARREN**
**CIRCUIT COURT JUDGE**



# EXHIBIT H

# (Dallas Circuit Court Complaint)

# STATE OF MICHIGAN
# IN THE CIRCUIT COURT FOR THE COUNTY OF LIVINGSTON
# BUSINESS COURT

**DALLAS INTERNATIONAL, LLC**, a
Michigan limited liability company

        Plaintiff,

v.

**FRATENITE, LLC d/b/a THE
GANWOOD COMPANY**, a Michigan
limited liability company; **WILLIAM EDWIN
SMALL**, an individual; **MATT BISSET**,
an individual; and **TODD MAILLOUX**,
an individual,

        Defendants.

Case No. 22-31482-CB

Hon. Michael Hatty

(𝓼 TRUE COPY
44TH Circuit Court
County Clerk's Office

| | |
|---|---|
| JAFFE RAITT, HEUER & WEISS, P.C.<br>R. Christopher Cataldo (P39353)<br>Benjamin M. Low (P82834)<br>Attorneys for Plaintiff<br>27777 Franklin Road, Suite 2500<br>Southfield, Michigan 48034<br>(248) 351-3000<br>ccataldo@jaffelaw.com<br>benlow@jaffelaw.com | BODMAN PLC<br>Ralph E. McDowell (P39235)<br>Dennis J. Levasseur (P39778)<br>Attorneys for Defendants Mailloux and<br>  Bisset<br>6th Floor at Ford Field<br>1901 St. Antoine Street<br>Detroit, MI 48226<br>(313) 393-7596<br>rmcdowell@bodmanlaw.com<br>dlevasseur@bodmanlaw.com<br><br>Jonathan B. Frank (P42656)<br>Janette E. Frank (P42661)<br>Frank & Frank Law<br>Attorneys for Defendant William Small<br>3910 Telegraph Rd., Ste. 200<br>Bloomfield Hills, MI 48302<br>(248) 723-8691<br>jonfrank@frankandfranklaw.com<br>janfrank@frankandfranklaw.com |

## FIRST AMENDED COMPLAINT

**DALLAS INTERNATIONAL, LLC**, a
Michigan limited liability company

       Plaintiff,

v.

**FRATENITE, LLC d/b/a THE**
**GANWOOD COMPANY**, a Michigan
limited liability company; **WILLIAM EDWIN**
**SMALL**, an individual; **MATT BISSET**,
an individual; and **TODD MAILLOUX**,
an individual,

       Defendants.

Case No. 22-31482-CB

Hon. Michael Hatty

| | |
|---|---|
| JAFFE RAITT, HEUER & WEISS, P.C.<br>R. Christopher Cataldo (P39353)<br>Benjamin M. Low (P82834)<br>Attorneys for Plaintiff<br>27777 Franklin Road, Suite 2500<br>Southfield, Michigan 48034<br>(248) 351-3000<br>ccataldo@jaffelaw.com<br>benlow@jaffelaw.com | BODMAN PLC<br>Ralph E. McDowell (P39235)<br>Dennis J. Levasseur (P39778)<br>Attorneys for Defendants Mailloux and<br>  Bisset<br>6th Floor at Ford Field<br>1901 St. Antoine Street<br>Detroit, MI 48226<br>(313) 393-7596<br>rmcdowell@bodmanlaw.com<br>dlevasseur@bodmanlaw.com<br><br>Jonathan B. Frank (P42656)<br>Janette E. Frank (P42661)<br>Frank & Frank Law<br>Attorneys for Defendant William Small<br>3910 Telegraph Rd., Ste. 200<br>Bloomfield Hills, MI 48302<br>(248) 723-8691<br>jonfrank@frankandfranklaw.com<br>janfrank@frankandfranklaw.com |

## FIRST AMENDED COMPLAINT

Plaintiff Dallas International, LLC ("Dallas" or "Plaintiff"), through its counsel, Jaffe, Raitt, Heuer & Weiss, P.C., hereby alleges and complains against Defendants Fratenite, LLC d/b/a The Ganwood Company ("Fratenite"), William Edwin Small ("Small"), Matt Bisset ("Bisset"), and Todd Mailloux ("Mailloux") (collectively the "Defendants") as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Dallas is organized under the laws of the State of Michigan and has its principal place of business in Brighton, Michigan.

2. Defendant Fratenite is a Michigan limited liability company which has it registered place of business in Brighton, Michigan.

3. Defendant Small is a Michigan resident who does business in Livingston County, Michigan and resides in Brighton, Michigan. Small is a member of Fratenite and a guarantor of Fratenite's debts to Dallas.

4. Defendant Bisset is a Michigan resident who does business in Livingston County, Michigan and resides in South Lyon, Michigan. Bisset is a member of Fratenite and a guarantor of Fratenite's debts to Dallas.

5. Defendant Mailloux is a Michigan resident who does business in Livingston County, Michigan and resides in South Lyon, Michigan. Mailloux is a member of Fratenite and a guarantor of Fratenite's obligations to Dallas.

6. The amount in controversy exceeds the sum of Twenty-Five Thousand Dollars ($25,000.00), exclusive of interest, costs, and attorneys' fees.

7. Venue is proper in this Court because the underlying contract provides for the jurisdiction in the Livingston County Circuit Court, Defendants do business and/or reside in Livingston County, and this matter is otherwise in the jurisdiction of this Court.

4856-9188-2029.v1

8.   This action qualifies as a business or commercial dispute and should be assigned to the Business Court under MCL 600.8031.

<strong><u>GENERAL ALLEGATIONS</u></strong>

9.   Dallas, among other things, makes loans and provides financial accommodations, including factoring transactions, to small and mid-size companies.

10.   Small was an owner of Dallas until January 1, 2016.

11.   Dallas did not have any employees. The employees of an affiliated entity called SCC Services, LLC, a Michigan limited liability company ("SCC"), performed certain day-to-day functions for Dallas.  SCC was member managed and Small was a member manager of SCC.

12.   At the request of Dallas' secured lender, Small had to withdrew as an owner of Dallas as evidenced by the First Amendment to Operating Agreement for Dallas dated as of January 1, 2016 (the "Dallas Amended Operating Agreement").  See Dallas Amended Operating Agreement, attached as **Exhibit A**.

13.   Despite his withdrawal as an owner of Dallas, Small used his position as a member manager of SCC to manipulate the true amounts owing by Fratenite and the Guarantors to Dallas.

14.   Small, Bisset and Mailloux each own or owned 33.33% (the "Percentage Interests") of Fratenite as set forth in the Operating Agreement for Fratenite dated as of April 6, 2016 (the "Fratenite Operating Agreement").  See Fratenite Operating Agreement, attached as **Exhibit B**.

15.   Net profits and losses are apportioned between the members of Fratenite in proportion to their Percentage Interests.  *Id.* at § 3.2.

16.   On or about June 21, 2016, Dallas entered into a Revolving Credit and Security Agreement, as amended by the First Amendment to Revolving Credit and Security Agreement

3

dated as of February 8, 2017, with Fratenite (the "Agreement"). *See* Agreement, attached as **Exhibit C**.

17. The "Obligations" under the Agreement are "the full and punctual observance and performance of all present and future duties, covenants and responsibilities due to Lender by Borrower under this Agreement, the Note, the Loan Documents and otherwise, all present and future obligations and liabilities of Borrower to Lender for the payment of money under this Agreement, the Note, the Loan Documents and otherwise (extending to all principal amounts, interest, late charges, fees and all other charges and sums, as well as all costs and expenses payable by Borrower under this Agreement, the Note, the Loan Documents and otherwise), whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, ***related or unrelated to this Agreement, whether or not now contemplated, whether or not any instrument or agreement relating thereto specifically refers to this Agreement***, *including, without limitation, overdrafts in any checking or other account of Borrower at Lender and claims against Borrower acquired by assignment to Lender, whether or not secured under any other document, or agreement or statutory or common law provision, as well as all renewals, refinancings, consolidations, re-castings and extensions of any of the foregoing, the parties acknowledging that the nature of the relationship created hereby contemplates the making of future advances by Lender to Borrower.*" *Id* (emphasis added).

18. Small, Bisset, and Mailloux (each a "Guarantor" or collectively the "Guarantors") are each listed as a Guarantor of Fratenite's Obligations under the Agreement. *Id*. at §§ 1.3, 4.2.

19. Paragraph 4.2 of the Agreement provides that Borrower shall cause Guarantor to execute a guarantee "for the Obligations" as defined in the Agreement.

20. Small, Bisset and Mailloux were part of a scheme to defraud Dallas by agreeing to execute the required guaranty documents and then have Small destroy the guaranty documents after they were sent to the accountants to enable Small, Bisset and Mailloux to take advantage of Fratenite's losses without subjecting themselves to liability to Dallas.

21. In an email to Bissett and Mailloux, Small stated the following: "Please follow suit with your information so CB [CB is Small's sister Carrie Small-Belkowski who was an employee of SCC working under the direction of Small] can complete our PG [personal guaranty] for tax filing. We will NOT be PG's of the Dallas Loans as I will destroy the signed copies after I send to the CPA. It's a huge tax savings if we PG the loan on paper. Trump Taxes!!!!!!" (the "Small E-mail) See Small e-mail, attached as **Exhibit D**.

22. In response to an April 15, 2019 e-mail from Fratenite's accountants asking, "can you please let me know which of these [debts] you have guarantees, etc on (which creates recourse debt to allow losses to be deductible event if capital basis is eroded"), Small replied "PG Debt is $1.2 million today". (the "Accountant E-mail) See Accountant E-mail, attached as **Exhibit E**.

23. Based on the guaranty documents and information submitted by Small, Bisset and Mailloux to Fratenite's accountant, Small, Bisset and Mailloux each received a Fratenite K-1 for 2017 reflecting their $400,082 of Recourse debt to Dallas (33.300% of the $1,200,246 of guaranteed obligations owing to Dallas) providing each of them a business income loss of $92,903 against their ordinary income. See 2017 K-1s, attached as **Exhibit F**.

24. Based on the guaranty documents and information submitted by Small, Bisset and Mailloux to Fratenite's accountant, Small, Bisset and Mailloux each received a Fratenite K-1 for 2018 reflecting their $400,082 of Recourse debt to Dallas (33.300% of the $1,200,246 of

5

guaranteed obligations owing to Dallas) providing each of them a business income loss of $440,075 against their ordinary income. See 2018 K-1s, attached as **Exhibit G**.

25. Dallas does not have information whether further K-1s were issued to the Guarantors with additional losses to claim against their ordinary income as a result of their guarantees of the obligations of Fratenite to Dallas, and this information will need to be provided through discovery.

26. Pursuant to the Agreement, Fratenite will be in "default under this agreement and the other Loan Documents" if it "fails to pay within five (5) days after it is due any amount payable under this Agreement, the Note, the Loan Documents;" if it fails "to observe or perform according to, any provisions contained in the Loan Documents, or a default occurs under the terms of any of the Loan Documents;" if it "makes, or is deemed to have made, any materially incorrect, false, fraudulent or misleading representation;" if it or the Guarantors defaulted "under the terms of any lease or any other contractual agreement;" if it "becomes insolvent or unable to pay its debts as they become due" or if it changes its business or has a substantial change in its financial condition. *Id*. at §§ 8.1-8.14.

27. Upon Fratenite's default, Dallas has the right to foreclose on any collateral and "terminate this Agreement and declare the entire unpaid principal balance of the Note, plus all accrued and unpaid interest and fees to be immediately due and payable." *Id*. at §§ 9.1, 9.3.

28. Fratenite also agreed, that upon its default, Dallas "shall be entitled to any form of equitable relief that may be appropriate" and that "[a]ll post-judgment interest shall bear interest at the annual rate of eighteen percent (18%)." *Id*. at § 9.6.

29. Dallas can also "demand full payment of the Note and any other indebtedness of [Fratenite] to [Dallas] under the Loan Document" and Fratenite agreed that it would be "liable to

6

[Dallas] for all actual costs of every kind incurred in the collection of the Note or this Agreement, including, without limitation, actual attorneys' fees and court costs." *Id*. at § 9.7.

30. Fratenite ceased business operations on or about December 1, 2020.

## The Guarantees

31. Despite Small's and other Guarantors' efforts to conceal such documents, Dallas located copies of an Unlimited Guaranty (individually a "Guaranty" or collectively the "Guarantees") executed by each Guarantor in favor of Dallas. *See* each Unlimited Guaranty, attached as **Exhibit H**.

32. Pursuant to the Guarantees, each Guarantor "unconditionally guaranties to [Dallas] the timely (whether as scheduled or upon acceleration) payment and performance by [Fratenite's] obligations under the Agreement as well as any loss or damage that [Dallas] may sustain due to any loss or exposure arising under the Agreement (the "Guaranteed Obligations)." *Id*. at § 3. Accordingly, the Guaranty expressly covers all "Obligations" as defined in the Agreement.

33. Each Guarantor also agreed that the Lender may do any of the following without releasing or exonerating Guarantor from any of the Guarantied Obligations: "(i) renew, extend, rearrange, alter, impair, suspend or otherwise modify the Agreement, any of the Guarantied Obligations or any of the rights or remedies of Lender under the Agreement", and "(v) advance additional funds to or for the benefit of Borrower". *Id*. at § 7.

## The Line of Credit Loan

34. Beginning in 2016, Dallas made numerous advances to Fratenite under the line of credit loan under the Agreement (the "Line of Credit Loan"). The Line of Credit Loan is an Obligation under the Agreement and a Guarantied Obligation under each Guaranty.

4856-9188-2029.v1

35. Concurrently with the Agreement, on June 21, 2016, Dallas entered into Line of Credit Promissory Note, as amended on February 8, 2018 (the "Line of Credit Note") with Fratenite. *See* Line of Credit Note, as amended, attached as **Exhibit I**.

36. The interest rate on the "unpaid Principal Amount of this Note" was "two percent (2%) in excess of the prime rate of interest as reported by *The Wall Street Journal* (the "Index"), as such Index may vary from time to time" (the "Effective Interest Rate") and the Default Interest Rate was "six percent (6%) greater than the Effective Interest Rate otherwise applicable or at a rate equal to the maximum rate allowed by law, whichever is less." *Id*. at §§ 2, 14.

37. Fratenite agreed that it would make payments on the "[a]ccrued interest on all Principal Amounts advanced by Lender from time to time and unpaid by Borrower . . . on the last day of the month of the Effective Date, and on the last day of each consecutive month thereafter until the above stated Due Date, upon which date the entire unpaid balance of this Note and all accrued and unpaid interest and fees shall be due and payable to [Dallas] in full." *Id*. at § 5.

### The Term Loans

38. In addition to the Line of Credit Loan, beginning in August of 2016 Dallas made numerous term loans to Fratenite over time (collectively the "Term Loans"). The Term Loans are an Obligation under the Agreement and a Guarantied Obligation under each Guaranty.

39. On August 3, 2016, Dallas entered a Promissory Note, as amended on February 8, 2018 and September 5, 2018, as additional Term Loans were made by Dallas to Fratenite (collectively the "First Term Note"). *See* First Term Note, as amended, attached as **Exhibit J**.

40. The August 2016 Note incorporated the Agreement and "any Related Loan Documents, or in any other loan agreement, mortgage, guaranty, security agreement, assignment or other documents relating to this Note." *Id*. at §§ 8 and 10.

4856-9188-2029.v1

41. As Dallas continued to make additional Term Loans to Fratenite, on January 15, 2019, Dallas entered into a Promissory Note – Equipment with Fratenite, as amended on February 27, 2019 (the "Second Term Note"). *See* Second Term Note, attached as **Exhibit K**.

42. The Second Term Note relaced the First Term Note.

43. The interest rate on the "unpaid Principal Amount of this Note" was "twelve percent "12.00%" (the "Effective Interest Rate")" and the Default Interest Rate was "ten percent (10%)" greater than the Effective Interest Rate otherwise applicable or at a rate equal to the maximum rate allowed by law, whichever is less." *Id*. at §§ 2, 8.

44. Fratenite agreed that it would make monthly payments of "Eight Thousand Four Hundred and 49/1-0- Dollars ($8,400.49) until the entire principal balance, together with all accrued and unpaid interest, expenses, and costs have been pai in full." *Id*. at § 4.

45. The due date for the Second Term Note was "[t]he earlier of demand or January 15, 2024." *Id*.

46. The Second Term Note incorporated the Agreement and "any Related Loan Documents, or in any other loan agreement, mortgage, guaranty, security agreement, assignment or other documents relating to this Note." *Id*. at §§ 7 and 9.

### The Accounts Purchase and Security Agreement

47. In addition to the Line of Credit Loan and the Term Loans, on November 27, 2018, Sterling Commercial Credit, LLC ("Sterling") entered into an Accounts Purchase and Security Agreement with Fratenite (the "Accounts Agreement"). *See* Accounts Agreement, attached as **Exhibit L**. The Accounts Agreement is an Obligation under the Agreement and a Guarantied Obligation under each Guaranty.

48. Under the Accounts Agreement, Sterling agreed to provide Fratenite financial accommodations. *Id*. at § 1.

4856-9188-2029.v1

49. In the Accounts Agreement, Fratenite (1) agreed to make certain payments to Sterling and (2) sold and assigned to Sterling its accounts receivable.

50. Fratenite, further, agreed that it was required to pay Sterling any amounts due and owing to Sterling for accounts Sterling purchased that Sterling was not repaid on. *Id*. at § 16.1.

51. Pursuant to the Accounts Agreement, among other things, Fratenite agreed that it would "reimburse [Sterling] on demand for:" "[t]he actual amount of all costs and expenses, including attorneys' fees, [Sterling] has incurred or may incur in . . . protecting, preserving or enforcing any lien, security or other right granted by [Fratenite] to [Sterling] or arising under applicable law. . . ." *Id*. at § 25.1.

52. On November 27, 2018, concurrently, and as part of, the Accounts Agreement, Sterling assigned the Accounts Agreement to Dallas. *Id*.

53. Small executed an Unlimited Guaranty dated as of November 27, 2018 of Fratenite's obligations under the Accounts Agreement in favor of Dallas. *See* Accounts Purchase and Security Agreement, attached as **Exhibit M**.

<u>**Defendants' Defaults**</u>

54. Fratenite and Guarantors are in default to Lender because, among other reasons:

A. Fratenite and Guarantors failed to make timely payments on the Line of Credit Loan;

B. Fratenite and Guarantors failed to make timely payments on the Term Loans;

C. Fratenite and Guarantors failed to make timely payments on the Accounts Agreement; and

D. Fratenite has ceased its business operations.

55. The outstanding principal owed by the Defendants on the Term Loans is $597,470.51.

56. The outstanding interest owed by the Defendants on the Term Loans is $139,396.94 as of August 1, 2022.

4856-9188-2029.v1

57. Interest and fees accrued and shall continue to accrue on the Term Loans.

58. The outstanding principal owed by the Defendants on the Line of Credit Loan is $1,417,364.10.

59. The outstanding interest owed by the Defendants on the Line of Credit Loan is $355,737.51 as of August 1, 2022.

60. Interest and fees accrued and shall continue to accrue on the Line of Credit Loan.

61. The outstanding obligations under the Accounts Agreement is $21,371.56 as of August 1, 2022.

62. Despite their obligations to do so, Defendants have not paid the obligations under the Line of Credit Loan, the Term Loans and the Accounts Agreement, which have become immediately due and owing due to Defendants' defaults.

## COUNT I:
### BREACH OF CONTRACT
### (FRATENITE)

63. Dallas incorporates the above allegations as if fully restated here.

64. The Line of Credit Note, the Second Term Note, the Guarantees, the Agreement and the Accounts Agreement are valid contracts between the Parties (collectively the "Fratenite Agreements").

65. Pursuant to the Fratenite Agreements, Fratenite was required to make payments on over time to Dallas and was required to pay the amount of the outstanding obligations thereunder upon the expiration of their term or upon Fratenite's default of any of its agreements with Dallas.

66. Fratenite failed to make its required payments due Dallas.

11

67. As a result of Fratenite's refusal to pay its Obligations to Dallas, Dallas has been damaged in the amount of $2,531,340.60, exclusive of accruing interest, costs, and attorneys' fees, which the Dallas is entitled to under the Parties' agreements.

WHEREFORE, Dallas respectfully requests that the Court enter a judgment against Fratenite in the amount of at $2,531,340.60, plus accruing interest, costs, and attorneys' fees as permitted by the Parties' contracts and law, and grant Dallas all such relief which is just and appropriate under the circumstances.

### COUNT II:
### BREACH OF CONTRACT – GUARANTEES
### (THE GUARANTORS)

68. Dallas incorporates the above allegations as if fully restated here.

69. The Fratenite Agreements including the Guarantees are valid contracts between the Parties.

70. Pursuant to the Guarantees, the Guarantors were required to pay the Obligations upon Fratenite's default of any of its agreements with Dallas and the expiration of the due dates of the Notes.

71. Fratenite has failed to pay the Obligations in the total amount of $2,531,340.60 despite its defaults of its agreements with Dallas.

72. As a result of the Guarantors' refusal to pay their Obligations to Dallas, Dallas has been damaged in the amount of $2,531,340.60, exclusive of accruing interest, costs, and attorneys' fees, which the Dallas is entitled to under the Fratenite Agreements.

WHEREFORE, Dallas respectfully requests that the Court enter a judgment against the Guarantors, jointly and severally, in the amount of at $2,531.340.60, plus accruing interest, costs,

and attorneys' fees as permitted by the Parties' contracts and law, and grant Dallas all such relief

which is just and appropriate under the circumstances.

Respectfully submitted,

/s/Benjamin M. Low
R. Christopher Cataldo (P39353)
Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
ccataldo@jaffelaw.com
benlow@jaffelaw.com

Dated: August 10, 2022

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is employed by Jaffe, Raitt, Heuer & Weiss, P.C., and that on August 10, 2022 a copy of the foregoing *First Amended Complaint* was served on counsel of record via Electronic and First Class Mail.

/s/ Pamela R. Mathews
pmathews@jaffelaw.com

4856-9188-2029.v1

# EXHIBIT I

# (Livingston Circuit Court Notice of Hearing)

| STATE OF MICHIGAN<br>44TH CIRCUIT COURT<br>JUDICIAL CIRCUIT<br>LIVINGSTON | PROOF OF SERVICE FOR<br>PARTY NOTIFICATION | CASE NO.<br>2022 0000031482-CB |
|---|---|---|

204 S HIGHLANDER, STE 4                 (517)546-9816
HOWELL, MI 48843

Judge: MATTHEW J. MCGIVNEY          Date: MONDAY JULY 07, 2025

| Plaintiff/Petitioner<br>DALLAS INTERNATIONAL LLC,, | v | Defendant/Respondent<br>FRATENITE LLC,, |
|---|---|---|

ORDER TO ADJOURN PLAINTIFF'S DISPOSITIVE MOTION HEARING

## CERTIFICATE OF MAILING

The following parties were served by e-mail (MCR 2.107(C)(4)):

| Name | Complete address of service |
|---|---|
| JONATHAN B. FRANK | jonfrank@frankandfranklaw.com |
| JUSTIN P. BAGDADY | jbagdady@bodmanlaw.com |
| JEFFREY ROBERT MAY | JMAY@bodmanlaw.com |
| RALPH E. MCDOWELL | RMCDOWELL@BODMANLAW.COM |
| R. CHRISTOPHER CATALDO | CCATALDO@TAFTLAW.COM |

07/07/2025
Date

Kelley Lindquist
Clerk

DALLAS INTERNATIONAL LLC,

      Plaintiff,

v

FRATERNITE LLC, WILLIAM               Case No. 2022-31482-CB
SMALL, MATT BISSET, AND             Hon. Matthew J. McGivney
TODD MAILLOUX,

      Defendants.

---

## ORDER TO ADJOURN PLAINTIFF'S DISPOSITIVE MOTION HEARING

At a session of court held in the courthouse in the
City of Howell, County of Livingston, State of
Michigan, on the 3rd day of July, 2025.

**PRESENT:**
FOR HONORABLE MATTHEW J. McGIVNEY
BUSINESS COURT JUDGE

**THIS MATTER HAVING COME BEFORE THE COURT** upon Plaintiff's motion for summary disposition on the novation issue, and the matter being scheduled for hearing on July 3, 2025, and Plaintiff's counsel appearing, and counsel for Defendant Bissett and Mailloux appearing, but counsel for Defendant Small failing to appear despite being instructed to do so by Court Staff, and the Court having received numerous proposed filings via email on July 3, 2025 up to 25 minutes prior to the scheduled dispositive motion, regarding a hotly contested request for stay of proceedings, and the Court having addressed the late filings with the counsel who appeared for the hearing, and the Court having reviewed the filings that are actually in the legal file, and the Court being otherwise fully advised in the premises;

**NOW THEREFORE IT IS ORDERED** that for the reasons set forth above and on the record on July 3, 2025, the hearing on Plaintiff's motion for summary disposition on the novation issue is ADJOURNED to **Friday, July 25, 2025 at 2:30PM.** The hearing shall be conducted via Zoom. The Zoom Meeting ID is 378 202 7655 and the passcode is 520961. No supplemental briefing is permitted on the dispositive motion, the response, nor the reply.

**IT IS FURTHER ORDERED** that the Court will also conduct a hearing on Defendants Bissett and Mailloux's Notice of Bankruptcy Filing and Request for Administrative Closure, and

the Court may also address Defendant Small's Notice of Bankruptcy Filing, on **Friday, July 25, 2025 at 2:30PM**, at the same Zoom location as described above.

**IT IS FURTHER ORDERED** that each party may submit a brief on the issue of the Notice of Bankruptcy Filing by Defendant Small and the Notice of Bankruptcy Filing and Request for Administrative Closure from Defendants Bissett and Mailloux's, with the limitation that each brief shall not exceed 10 pages, exclusive of exhibits. Judge's Copies of the briefs shall be submitted to JudgeMcGivneyMotions@livgov.com at the same time as filing, with filing to be completed no later than **July 21, 2025.**

**IT IS SO ORDERED.**

7-3-2025

Hon. Matthew J. McGivney (P63325)
Business Court Judge

# EXHIBIT J

## (New SCC Holdings Articles of Organization)



Form Revision Date 02/2017

## ARTICLES OF ORGANIZATION
For use by DOMESTIC LIMITED LIABILITY COMPANY

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

---

**Article I**

The name of the limited liability company is:

SCC HOLDINGS LLC

---

**Article II**

Unless the articles of organization otherwise provide, all limited liability companies formed pursuant to 1993 PA 23 have the purpose of engaging in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan. You may provide a more specific purpose:

---

**Article III**

The duration of the limited liability company if other than perpetual is:

---

**Article IV**

The street address of the registered office of the limited liability company and the name of the resident agent at the registered office (P.O. Boxes are not acceptable):

1.  Agent Name:          BRIAN REDDING

2. Street Address:       124 N. ROBINSON ST

   Apt/Suite/Other:

   City:                 SCHOOLCRAFT

   State:                MI                          Zip Code: 49087

3. Registered Office Mailing Address:

   P.O. Box or Street
   Address:              7576 S. CROOKED LAKE DRIVE
   Apt/Suite/Other:

   City:                 DELTON

   State:                MI                          Zip Code: 49046

---

Signed this 28th Day of April, 2025 by the organizer(s):

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Brian Redding | Organizer | |
| | | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

　Decline　　　　　　Accept

# *MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS*

## *FILING ENDORSEMENT*

*This is to Certify that the*   ARTICLES OF ORGANIZATION

*for*

SCC HOLDINGS LLC

*ID Number:*     803380826

*received by electronic transmission on*   April 28, 2025     *, is hereby endorsed.*

*Filed on*     May 01, 2025     *, by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 1st day of May, 2025.*

*Linda Clegg, Director*
*Corporations, Securities & Commercial Licensing Bureau*